In re **TRADOS INCORPORATED**
**SHAREHOLDER**
**LITIGATION.**

No. CIV.A. 1512–VCL.

Court of Chancery of Delaware.

Submitted: May 21, 2013.
Decided: Aug. 16, 2013.

David A. Jenkins, Michele C. Gott, Robert K. Beste, III, Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware; Timothy J. McEvoy, Cameron McEvoy, PLLC, Fairfax, Virginia; Attorneys for Plaintiff Marc Christen.

Raymond J. DiCamillo, Scott W. Perkins, Richards, Layton & Finger, P.A., Wilmington, Delaware; David J. Berger, Elizabeth M. Saunders, Steven Guggenheim, Wilson Sonsini Goodrich & Rosati, P.C., Palo Alto, California; Attorneys for Defendants David Scanlan, Lisa Stone, Sameer Gandhi, Joseph Prang, Klaus–Dieter Laidig, Joseph Campbell, and Jochen Hummel.

John L. Reed, Scott B. Czerwonka, Andrew H. Sauder, DLA Piper LLP, Wilmington, Delaware; Attorneys for Defendant Trados Inc.

## OPINION

LASTER, Vice Chancellor.

TRADOS Inc. ("Trados" or the "Company") obtained venture capital in 2000 to support a growth strategy that could lead to an initial public offering. The VC firms received preferred stock and placed representatives on the Trados board of directors (the "Board"). Afterwards, Trados increased revenue year-over-year but failed to satisfy its VC backers. In 2004, the VC directors began looking to exit. As part of that process, the Board adopted a management incentive plan (the "MIP") that compensated management for achieving a sale even if the transaction yielded nothing for the common stock.

In July 2005, SDL plc acquired Trados for $60 million in cash and stock (the "Merger"). Under Trados's certificate of incorporation, the Merger constituted a liquidation that entitled the preferred stockholders to a liquidation preference of $57.9 million. Without the MIP, the common stockholders would have received $2.1 million. The MIP took the first $7.8 million of the Merger consideration. The preferred stockholders received $52.2 million. The common stockholders received nothing.

Directors of a Delaware corporation owe fiduciary duties to the corporation and its stockholders which require that they strive prudently and in good faith to maximize the value of the corporation for the benefit of its residual claimants. A court determines whether directors have fulfilled their fiduciary duties by evaluating the challenged decision through the lens of the applicable standard of review. Because a board majority comprised of disinterested and independent directors did not approve the Merger, the defendants had to prove that the transaction was entirely fair.

The plaintiff contended that instead of selling to SDL, the Board had a fiduciary duty to continue operating Trados independently in an effort to generate value for the common stock. Despite the directors' failure to follow a fair process and their creation of a trial record replete with contradictions and less-than-credible testimony, the defendants carried their burden of proof on this issue. Under Trados's business plan, the common stock had no economic value before the Merger, making it fair for its holders to receive in the Merger the substantial equivalent of what they had before. The appraised value of the common stock is likewise zero.

# I. FACTUAL BACKGROUND

Trial took place over five days in February and March 2013. The parties introduced over 650 exhibits, submitted deposition testimony from twenty witnesses, and adduced live testimony from eight fact and two expert witnesses. Because this case did not involve a transaction to which entire fairness applied *ab initio,* the burden of proof rested on the plaintiff initially to prove facts sufficient to rebut one of the elements of the business judgment rule. Once the plaintiff proved that a disinterested and independent board majority did not approve the Merger, the burden shifted to the defendants to establish that their decisions were entirely fair. Having evaluated the witnesses' credibility and weighed the evidence as a whole, I find the facts to be as follows.

## A. Trados's Early Days.

Defendant Jochen Hummel and Iko Knyphausen founded Trados in 1984. Hummel became Chief Technology Officer and served on the Board. Knyphausen left the Company and did not play a significant role in the case.

Trados developed proprietary desktop software for translating documents. In overly simplistic terms, the software stored a database of words and phrases. When presented with a new document, the software identified words and phrases found in its database and replaced them with their foreign counterparts.

By the late 1990s, Trados enjoyed a dominant position in the desktop translation market. To expand, Trados sought to penetrate the enterprise market. As the name suggests, customers in this market are large corporate and government enterprises whose many users run programs on a network. Trados also envisioned transitioning its products to the internet and connecting translators directly with purchasers of translation services.

At the turn of the third millennium of the Common Era, Trados sought VC funding to spur its growth and help position itself for an IPO. At the time, Trados differed significantly from the stereotypical dot-com startup. Trados had been around for sixteen years and sold a successful desktop product. In 1999, the Company generated $11.3 million in revenue and was preparing to release its first enterprise products. In 2000, Trados generated revenue of $13.9 million, representing year-over-year growth of approximately 23%.

## B. Wachovia Invests In Trados.

In early 2000, Trados came to the attention of First Union Capital Partners, the predecessor to Wachovia Capital Partners, LLC ("Wachovia"). For simplicity, this decision refers only to Wachovia. Around March 2000, after conducting due diligence, Wachovia invested $5 million. Defendant David Scanlan, a Wachovia partner, sponsored the investment. In return, Wachovia received 1,801,303 shares of Series A Participating Preferred Stock ("Series A") and 1,838,697 shares of Series B Non–Voting Convertible Preferred Stock ("Series B"), which were convertible on a 1–for–1 basis into Series A. Wachovia later converted, bringing its total Series A shares to 3,640,000. Because the conversion rendered the Series B irrelevant, this decision discusses only the Series A.

Each Series A share had an initial liquidation preference equal to its purchase price of $1.374. The stock paid a cumulative dividend at a rate of 8% per annum with unpaid dividends increasing the liquidation preference. As participating preferred, the Series A shared in any remaining distribution available for the common stock, subject to a cap not relevant to the

case. At its option, Wachovia could convert the Series A into common stock pursuant to a formula in the Company's certificate of incorporation. The Series A had the right to veto any attempt by Trados to (i) amend its certificate of incorporation, (ii) authorize, issue, or reclassify shares, (iii) make, authorize, or approve dividends or distributions, (iv) redeem, repurchase, or acquire stock, (v) change the number of directors, or (vi) effect any change of control. The Series A also had the right to vote with the common stock on an as-converted basis.

As part of the investment, Wachovia obtained the right to designate a director. Wachovia designated Scanlan.

## C. Hg Invests In Trados.

Around the same time, Trados came to the attention of Mercury Capital, the predecessor to Hg Capital LLP ("Hg"). For simplicity, this decision refers only to Hg. In April 2000, Hg invested $10.25 million in exchange for 5,333,330 shares of Series C Preferred Stock ("Series C"). Each Series C share had an initial liquidation preference equal to its purchase price of $1.922. Its other rights paralleled and participated *pari passu* with the Series A, except that the Series C was not participating preferred.

In August 2000, Hg invested an additional $2 million in exchange for 862,976 shares of Series D Preferred Stock ("Series D"). Each Series D share had an initial liquidation preference equal to its purchase price of $2.3176. Its other rights paralleled and participated *pari passu* with the Series C, including the cumulative dividend and veto rights. In September 2000, Hg bought 1,379,039 shares of common stock for approximately $2.3 million.[1]

Like Wachovia, Hg obtained the right to designate a director. The relevant director for this case is defendant Lisa Stone, a partner at Hg who joined the Board in mid–2002.

## D. Trados Builds Its Business.

By February 2001, Trados was attracting new, large corporate clients. In May, Trados released the latest version of its desktop software, Trados 5.

In September 2001, Wachovia and Hg made follow-on investments in Series BB Preferred Stock ("Series BB"). Wachovia paid $1.0 million for 1,007,151 shares. Hg paid $2.0 million for 2,014,302 shares. Each Series BB share had an initial liquidation preference equal to its purchase price of $0.9929. Otherwise the rights of the Series BB paralleled and participated *pari passu* with the Series A, including its status as participating preferred.

At the end of 2001, Trados released the MultiTerm Client Server, an enterprise product that provided a web interface for customer databases. Revenue for the year reached $15.9 million, a 14% increase over 2000, even after the negative effects of the 9/11 terrorist attacks.

## E. Trados Acquires Uniscape.

Although Trados was growing and making progress in the enterprise market, management felt the Company could accelerate its growth with an acquisition. Trados focused on Uniscape, Inc., a software company with a superior enterprise product. By acquiring Uniscape, Trados hoped

---

1. Hg invested £1.663 million to buy the common stock. JX 107. The transaction closed on September 19, 2000. JX 474 at 00372. The exchange rate was $1.4043 per pound, yielding a dollar-denominated investment of $2.3 million. *See* Historical Exchange Rates, OANDA, http://www.oanda.com (providing dollar per pound exchange rate on September 19, 2000).

to gain strong enterprise development and sales teams.

Like Trados, Uniscape had received several rounds of VC funding. Uniscape's principal backer was Sequoia Capital ("Sequoia"), a prominent Silicon Valley VC firm. Through various funds, Sequoia had invested $13 million in Uniscape. Defendant Sameer Gandhi, the Sequoia partner who sponsored the Uniscape investment, served on its board.

Another member of the Uniscape board was defendant Joseph Prang, the CEO of Conformia Software, Inc. Prang and a business partner used Mentor Capital Group LLC ("Mentor") as their investment vehicle. Through Mentor, Prang had invested approximately $700,000–750,000 of his own money in Uniscape. *See* Prang Dep. 17–19; Tr. 794–95.

In May 2002, Trados and Uniscape merged in a stock-for-stock transaction that valued Trados at $30 million, Uniscape at $11 million, and the post-transaction entity at $41 million. *See* JX 474 at 00383–91 (recording stock issuance for transaction); JX 268 at 4 (memorializing per share purchase price as liquidation preference); JX 566. International Data Corporation ("IDC"), a market research firm, described the transaction as a "win-win." JX 75 at 4. To acquire Uniscape, Trados issued 14,806,097 shares of Series E Preferred Stock ("Series E") to the former Uniscape stockholders, with substantially all of it going to Uniscape's preferred stockholders. Sequoia received 5,255,913 Series E shares, and Mentor received 263,810 Series E shares. Each Series E share carried an initial liquidation preference of $0.7248, equal to its effective purchase price. Its other rights paralleled and participated *pari passu* with the Series C.

As a result of the transaction, Sequoia wrote down its investment in Uniscape to $3.8 million. The value of Mentor's investment dropped to $191,209. The reduced amounts represented what Sequoia and Mentor actually invested in Trados. For their own purposes, however, Gandhi and Prang continued to view their investments in terms of the much larger amounts they originally invested in Uniscape.

In the transaction, Sequoia gained the ability to designate two Trados directors. Sequoia designated Gandhi and Prang.

## F. Invision Invests In Trados.

In August 2002, Trados raised $2 million from Invision AG, a Swiss private equity firm. Invision received 2,350,174 shares of Series F Preferred Stock ("Series F"). Each share of Series F carried an initial liquidation preference equal to its purchase price of $0.8510. Its other terms paralleled and participated *pari passu* with the Series C.

Invision received the ability to designate a director and named defendant Klaus-Dieter Laidig in December 2002. Unlike Scanlan, Stone, and Gandhi, Laidig was not the Invision partner who sponsored the Trados investment. Laidig was a technology consultant who previously worked as an executive at Hewlett-Packard for over thirty years. Laidig had a part-time consulting relationship with Invision that paid him a nominal amount for handling various projects. Laidig served on the boards of two other Invision portfolio companies and advised one of Invision's funds.

## G. Trados Continues To Grow Slowly.

The Board hoped that the Uniscape transaction would transform Trados. The transaction sought to unite the strengths of Trados's desktop software and Uniscape's enterprise platform, but integration difficulties plagued the combined company. Trados's desktop software programmers

operated in a Microsoft environment, and their knowledge, skills, and practices were tailored to it. Uniscape's enterprise software programmers operated in a Java environment and were equally specialized. The two teams had difficulty communicating and resisted compromise. Rather than capturing synergies, Trados ended up maintaining two separate code sets and two different engineering teams.

Trados's performance in 2002 reflected these challenges. For the year, Trados generated $19.8 million in revenue, a 25% year-over-year increase, but far below the budgeted figure of $27 million. JX 95 at 4; JX 98 at 05079. In response, Trados cut costs by closing or downsizing regional offices, consolidating operations, and renegotiating leases. In January 2003, management developed a plan to combine the two code sets through Project Genesis, an effort that would "[u]nify our products on to a next generation platform" and "[d]evelop a leveraged product organization and product suite." JX 99 at 05108. Hummel, Trados's CTO, believed completing Project Genesis was feasible and would keep Trados at the leading edge for another decade. Tr. 597–602.

Gandhi's mid-year report to his partners at Sequoia described Trados as "on track." JX 105. He continued: "By year-end, we should have a business that can scale profitably in 2004 ... [and] ~$35M in revenue looks achievable. The government business is heating up and could account for 20–25% of revenue next year. No immediate actions are required here." *Id.* Gandhi nevertheless cautioned that in terms of returns for Sequoia, Trados was unlikely to be a winner: "Within 18 months the company will be a decent acquisition target (Documentum, possibly?). Investment outlook: return capital at best. We do not own enough of the company to generate a meaningful return." *Id.*

Stone gave her partners at Hg a similar mid-year evaluation of the business:

> Overall, the management team is performing adequately but there are emerging issues around the HQ location, following the merger last year with Uniscape, that will need to be addressed. The market for software sales, particularly in the enterprise arena, is tough. The business is however making reasonable progress, with some significant new customer wins and sales up 10% from last year. Overall, the business is forecasting breaking even this year.

JX 107 at 000062.

In August 2003, Invision invested another $2 million and received 2,428,513 shares of Series FF Preferred Stock ("Series FF"). Each Series FF share carried an initial liquidation preference of $0.8235, equal to its purchase price. Its other terms paralleled and participated *pari passu* with the Series C. That same month, Trados's management presented the Board with a detailed plan to complete Project Genesis under Hummel's leadership. *See* JX 114 at 02161–73. The plan showed estimated project costs of $964,150 if a portion of development was outsourced and $1,626,750 if kept in-house.

In September 2003, Trados released a new version of MultiTerm, an enterprise product that Trados described as "the most sophisticated, flexible and scaleable [sic] terminology management system on the market today" and "a powerful database solution designed to standardise [sic] terminology and distribute it throughout the enterprise over the Internet or intranet at the click of a button." JX 120. Trados also updated its desktop product and prepared to launch TeamWorks, another enterprise product. JX 125. A Board presentation from October anticipated completing Project Genesis by the second quarter of 2005. *Id.* at 66.

By the end of 2003, Trados generated $24.8 million in revenue, achieving 25% year-over-year growth and making budget. Enterprise product revenue reached $3.0 million, representing more than 200% growth year-over-year. JX 137 at 10. On the downside, the Company remained unprofitable, and its cash balance declined. Stone provided her partners with another summary of the Company's mixed performance, noting that the business was making "reasonable progress." JX 133 at 000069. Gandhi was more positive about the business:

> The company made significant strides this year in preparation for greater growth in 2004. Progress includes: major upgrade to [the] management team . . .; consolidation of HQ in Sunnyvale (moved management team from VA); [and] consolidation of R & D . . . . Management has demonstrated the ability to execute on multiple complex initiatives simultaneously. With this work complete, and with the best pipeline ever entering a new fiscal year, this company should be able to grow 50% and generate cash in 2004.

JX 129. The "major upgrade to [the] management team" included a new CFO, James Budge. But despite these positive signs, Gandhi again bluntly assessed the prospects for a significant return to Sequoia: "Unfortunately, while we might end up with an attractive software company, our ownership position makes it difficult to do much more than hope to recover a portion of invested capital." Id.

In early 2004, with Trados coming off a record revenue year, Gandhi asked the head of software investment banking for JMP Securities ("JMP"), Kevin McClelland, to approach Trados's then-CEO, Dev Ganesan. McClelland's mission was to reach out to Ganesan and begin setting the table for a sale by discussing "opportunities for Trados in the public equities and M & A markets." JX 139. McClelland emailed Ganesan, and the two met in person in February 2004.

## H. The Board Replaces Ganesan.

During the first quarter of 2004, Trados's efforts to capture government business faltered because its three non-US directors and significant overseas equity ownership made it difficult to comply with federal contracting requirements. At a Board meeting on April 20, 2004, Ganesan detailed the Company's first quarter performance and discussed the outlook for the year. Management had projected revenue of $33 million for 2004, representing year-over-year growth of 33%. Although first quarter revenue was ahead of budget, the Company lost $2.5 million, more than expected, and Trados's cash balance fell to $6.6 million. Ganesan lowered the revenue forecast for the year from $33 million to $28 million. He then proposed maintaining headcount.

For the Board, this was a tipping point. Stone testified that the Board had been thinking about replacing Ganesan since the beginning of the year. See Tr. 688. Scanlan noted that Ganesan had consistently missed his budgets, and the directors felt the Company was running out of time. See Tr. 242–43. During the April 20 meeting, the Board terminated Ganesan. The directors appointed Hummel as Acting President, but instructed him to consult with Scanlan and Gandhi "before taking any material action on behalf of the Corporation." JX 152. The Board tasked Scanlan with leading the search for a replacement CEO. The Board also decided to explore whether the Company could be sold in the near-term. The Board sent Hummel to meet with Trados's principal commercial relationships—Microsoft, Bowne Global Solutions ("Bowne"), and

Documentum, Inc.—to explore their interest in the Company. They also decided to have JMP "test the waters" for a potential sale with a broader set of acquirers. JX 186.

Hummel struck out. In June 2004, he met with Microsoft, historically a large user of Trados's desktop product. In April 2000, to solidify the relationship, Microsoft had purchased 6,927,660 shares of Trados common stock. Microsoft listened appreciatively to Hummel's report on recent developments but made clear they had no interest in acquiring Trados. Hummel's efforts with Bowne and Documentum were similarly unsuccessful.

Gandhi took the lead on the broader market canvass. On June 24, 2004, David Silver of Santa Fe Capital Group contacted Gandhi about one of his clients, SDL, who was "prepared to make an offer" for Trados. JX 182. Gandhi quickly signed a nondisclosure agreement with Silver. *Id.* At the same time, Gandhi and Budge negotiated the terms of Trados's engagement of JMP. On June 30, Trados formally retained JMP to "advise [Trados] concerning opportunities for maximizing shareholder value, which may include a sale or merger of the Company." JX 192 at 00544. The engagement letter contemplated a 1.50% transaction fee for a deal with SDL or Lionbridge Technologies, Inc. ("Lionbridge"), the two most logical acquirers, and a 1.75% transaction fee for a deal with another party. The same day, Silver introduced SDL's CEO, Mark Lancaster, to McClelland via email.

Meanwhile, Scanlan worked with an executive search firm to identify candidates for the CEO position. His efforts ultimately led to defendant Joseph Campbell, the former COO of iManage, Inc., a company in the enterprise content management space. Campbell oversaw a highly successful sale of iManage to Interwoven in 2003. Although initially not interested, Campbell became convinced that Trados represented an attractive opportunity after conducting due diligence and speaking with members of the Board.

With the dual distractions of a sale process and CEO search, the Company's business understandably faltered. Second quarter revenue came in at $5.8 million, missing budget by 8%, and Trados incurred a $1 million loss.

## I. The Board Decides To Hire Campbell And Passes On A Distressed Sale.

On July 7, 2004, the Board approved hiring Campbell, and Scanlan suggested that the Board consider adopting a plan to incentivize senior executives to pursue a sale, which later became the MIP. The Board agreed, recognizing that otherwise the management team "may not have sufficient incentives to remain in the Company's service and to pursue a potential acquisition of the Company, due to the high liquidation preference of the Company's preferred stock." JX 200 at 4.

At the same meeting, McClelland reviewed the prospects for a sale. JMP's presentation valued Trados using comparable company and comparable transaction methodologies. The comparable company analysis generated a median multiple of 2.0 times last-twelve-months ("LTM") revenue, implying an enterprise value of approximately $55 million. The comparable transaction analysis examined seven acquisitions from July 2003 through February 2004 involving "Selected Content Management and Search Companies." JX 198 at 15. It generated a median multiple of 2.8 times LTM revenue, implying an enterprise value of approximately $75 million. JMP's full valuation range was quite broad, extending from $20.4 million to $169.8 million.

JMP's materials identified twenty-eight potential acquirers. JX 198 at 7. In addition to SDL, which had initiated contact through Gandhi, JMP reached out to Lionbridge, Documentum, Filenet, Verity, Adobe, IBM, and Open Text. Most had no interest, and Lionbridge "terminated its discussions with the Company shortly after receiving the Company's financial statements." JX 200 at 5. Only SDL seemed serious.

On July 15, 2004, Lancaster met with Stone to discuss SDL. She reported that Lancaster's "agenda was clearly to persuade [sic] me that Trados is better off with [SDL] than without and that selling to them for [stock] was a good idea." JX 208. Subsequently, Lancaster spoke with Gandhi and Scanlan by conference call. On July 26, Lancaster called McClelland and offered $40 million for the Company, consisting of $10 million in cash and $30 million in stock.

Given the low value that SDL put on the Company, the directors rejected the offer. McClelland informed SDL about the Board's "lack of interest at [the] current deal structure and valuation." JX 227. The decision did not mean that the Board was not interested in a sale. The directors understood that the Company had stumbled and was not putting its best foot forward. A new CEO could "fix it," particularly one with solid credentials as an operator and experience engineering a successful exit. Tr. 335.

At the end of July 2004, Scanlan and Campbell reached formal agreement on an employment package. Campbell's compensation included a base salary of $250,000, a 30% allocation of the as-yet-undocumented MIP, and options to acquire common stock representing 4% of the Company's fully diluted capitalization. His options had an exercise price "equal to the fair market value per share of the Company's Common Stock," which the Board had determined was $0.10 per share. JX 209 at 2. Campbell also would join the Board. Gandhi reported to Sequoia on the hire:

> We have recruited a hard-nosed CEO whose task is to grow this company profitably or sell it. The company has never had decent management, but with a new CEO, VP Sales, VP Marketing, and CFO in place, for the first time we will see what professional management can do. Simultaneously, [JMP] has also been retained to explore the M & A options for the business. I would expect that the company is sold within the next 18 months (perhaps sooner).

JX 172.

## J. Campbell's Initial Steps.

On August 23, 2004, Campbell officially began his tenure as CEO. He quickly discovered that the Company's cash position was worse than expected and that if Trados missed sales in the third quarter by the same margin as in the second, the cash situation would become dire by year-end. *See* Campbell Dep. I 31–32. After just two weeks on the job, Campbell called a Board meeting.

On September 8, 2004, the directors met. After describing the Company's situation, Campbell asked the VC representatives whether their firms would provide additional capital. Each declined. *See* Tr. 24; Campbell Dep. I 38–39.

Campbell then sketched out two alternatives. *See* JX 235 at 50424. Under the first scenario, Campbell would reposition Trados in the growing enterprise content management market, where iManage had operated. This would require investing in the Company's enterprise products, developing Project Genesis, and stressing content management rather than translation services. The last aspect was largely an

exercise in branding, but it could boost Trados's value because content management companies commanded higher multiples. Under this alternative, Campbell would aim for double digit top-line growth with break-even profitability in 2005. Campbell estimated that it would require $4 million in new capital. Under the second scenario, Campbell would focus on stabilizing the core business. His goal would be to achieve near-term profitability and "[e]ngage in M & A activities in December." JX 235 at 50427. This alternative required only $2 million in new capital.

The Board declined to select either option and asked Campbell to continue refining his views. The directors authorized him to seek venture debt financing to ameliorate the immediate cash problem.

On September 22, 2004, Campbell terminated Trados's relationship with JMP. Campbell did not want a "for sale sign" on the business while he was trying to fix its operations. Tr. 17. He also felt that keeping Trados on the market too long would put downward pressure on the Company's price. It was a gentle termination, and Campbell reassured McClelland that he anticipated reengaging. *See* JX 236.

### K. Campbell Shows What Professional Management Can Do.

With Campbell at the helm, the Company's situation began to improve. On the financing front, Campbell secured $4 million from Western Technology Investment ("Western Tech"), a provider of venture debt. Trados borrowed $2.5 million immediately and could draw the remaining $1.5 million by March 31, 2005. Western Tech charged interest of 12%, received warrants to acquire 366,000 Series FF shares immediately, and would receive additional warrants if the Company drew the balance of the venture debt. As is typical for venture debt, the loan came without any financial covenants. The Board was ecstatic; Scanlan called it a "miracle." Tr. 333.

The Company's fourth quarter results proved Campbell's mettle as an operator. Trados generated "record" revenue of $8.7 million and achieved a "record" profit of $1.1 million. JX 322 at 4. Enterprise revenue exceeded desktop, suggesting that the repositioning effort was gaining traction.

On the M & A front, SDL's investment banker contacted Stone in November 2004. Stone emailed Campbell that the banker wanted to speak with him, even though she suggested that "the time might not be right...." JX 265. Stone explained that SDL "remained v[ery] keen on doing the Trados deal" and "wanted to ensure that a dialogue was in hand...." *Id.* Campbell agreed that it was "very important to somehow keep SDL 'at the table.'" *Id.* As he explained,

> They are definitely one of the three [acquirers] that could potentially represent a positive exit strategy within the Globalization Market. From a positioning standpoint, we can begin to position me as the one brought in to increase shareholder value similar to that of iManage. That way they can understand why we turned down an offer of $40 Mill[ion] but may be amenable to a future offer quite a bit higher.

*Id.* SDL's banker also reached out to Gandhi. *See* JX 271.

In December 2004, Campbell met with Lancaster. The same month, Campbell and Budge presented the MIP to the Board. The plan provided senior management with an escalating percentage of sale proceeds depending on the valuation achieved. To the extent MIP participants also received consideration as equity holders, whether through common stock or options, their MIP payout would be reduced by the amount of the consideration

received. *See* JX 278 at 3. The cutback feature ensured that management would focus exclusively on proceeds received through the MIP rather than from their status as common stockholders. The Board allocated 30%, 12%, and 10% of the MIP to Campbell, Hummel, and Budge, respectively. All of the directors, including Campbell and Hummel, voted to approve the MIP. *See* JX 277.

Gandhi summarized Trados's situation at year-end in a report to his partners at Sequoia. He wrote that Campbell had done "a decent job getting the company cleaned up and organized (witness a much better 2nd half to the year)" and that "[h]is mission is to architect an M & A exit as soon as practicable." JX 276. Gandhi remained negative about the potential returns: "Given the preference structure and likely exit valuation for this business, we unfortunately have to resign ourselves to getting a small fraction of our original Uniscape investment back." *Id.* He then reassured his partners that Trados was not taking up too much of his time: "I am not spending a lot of time on this investment, even though I remain on the board." *Id.*

## L. Exit Discussions Intensify.

On January 10, 2005, Lancaster emailed Campbell and stated "there is sufficient potential that exists for an SDL–Trados combination" such that the two should "continue a more detailed dialogue." JX 297. On January 17, Campbell reported to Scanlan that Lancaster was "very serious about taking next steps" and asked to meet with Stone and Scanlan before his next meeting with Lancaster. JX 298. Campbell also mentioned that he was "having another conversation" with Bowne, a major customer, and Golden Gate Capital, a private equity firm. *Id.*

On January 19, 2005, Campbell met with Scanlan and Stone and reviewed a presentation he had prepared entitled "Confidential M & A Discussions." JX 291; JX 299. Campbell outlined three "Hypothes[e]s for Trados Exit," labeled (i) Merge–Up, (ii) Harvest, and (iii) Merge–Up Adjacent. JX 291 at 3. The Merge–Up option entailed a merger with SDL, Bowne, or Lionbridge. This option was "low risk," could be achieved within six months, and yielded valuation expectations of 1.3–1.6 times revenue based on median trading multiples of comparable companies. *Id.* The Harvest option contemplated a private equity firm like Golden Gate Capital acquiring both Trados and Bowne. This option was "higher risk," could be achieved within nine months, and yielded valuation expectations "greater" than 2.0 times revenue. *Id.* at 3, 6. The highest risk option was Merge–Up Adjacent, which contemplated repositioning Trados as an enterprise content management provider and then achieving a merger in that space. The anticipated timeline for this option was twelve to eighteen months, and valuation expectations were less clear. The presentation did not include a stand-alone alternative.

On January 20, 2005, Campbell followed up with Scanlan, asking point blank: "What is an acceptable offer for Trados?" JX 300. Scanlan responded that "it really depends on the nature of the opportunity and the cash/stock dynamic" but promised to "give the dollar figure some thought." *Id.* Shortly thereafter, Scanlan asked Campbell to prepare "a proceeds waterfall analysis by class of stock and shareholder that reflects the current ownership of the company and the management incentive plan," and "run three sensitivities at $50 million, $60 million and $70 million." JX 299. Scanlan said that looking at the numbers "may move along people's view[s] on our alternatives." *Id.*

On January 21, 2005, Campbell updated Scanlan, Gandhi, and Stone about his discussions with Lancaster, reporting that they had a "very open and candid conversation" about "potentially putting our companies together." JX 302. Lancaster wanted "to see the two companies together in the next 3–5 months." *Id.* Lancaster also was "willing to raise cash if need be to try to acquire Trados in an effort to try to resolve the [stock] issue." *Id.*

Campbell then offered his thoughts on valuation, suggesting that "we need to be realistic about the offer range." JX 302. As Campbell saw it, "$45–$55 mil[lion] with 50%–75% in stock is where we will wind up. I also believe it's important for us to be realistic about this or any other offer. Trying to get above 2X revenue in our market is unprecedented . . . ." *Id.* Gandhi responded by asking Campbell to "optimize for true liquidity, not a higher paper valuation," by which he meant seeking more cash even if it meant a lower nominal price. *Id.* Campbell replied that getting more cash would be difficult:

> The original cash component from SDL was $10 mil, with $30 mil in paper. I do believe we've come a long way since then, but there is a question here on ability not desire. They claim to have the equivalent of $26 mil (US) in cash. I suggested SDL look to raising additional cash but I'm certain to make something happen with SDL . . . [t]here would still be some paper component to the deal. I think it's a stretch to imagine a $45–$55 mil cash deal from anybody . . . .

*Id.* Gandhi replied that he was "ok with [Campbell's] approach," but the group "should realize that sdl paper does in fact require a heavy duty discount." *Id.* Gandhi felt that "if [Trados] can get the cash component from sdl to $30m+ and get some stock, . . . that deal is very much in

the ballpark for what is reasonable for a business such as ours . . . ." *Id.*

Invision directly informed Hummel, however, that it would not sell below its entry valuation of $60 million. Hummel passed this along to Campbell. Soon thereafter, the Board reached a consensus that Campbell would seek $60 million from SDL. In his first deposition, Campbell testified that "[a]t this point in time 60 was the number we were attempting to achieve and not a penny higher than that." Campbell Dep. I 102.

## M. SDL And Trados Agree On Price And Structure.

On February 2, 2005, the Board met for an update on Trados's financial performance and to consider prospects for a transaction. Campbell trumpeted the Company's fourth quarter results: (i) "$8.7 mil in total revenue!!!—record quarter," (ii) revenue growth of 27% over the first half of 2004, and (iii) "$1.1 mil in profit from Operations—record profit." JX 318 at 4. The presentation listed several recent product sales (including a $1.8 million deal with HP), reported that Trados "[d]elivered TeamWorks 2.0," and indicated that offshore software development was "on track and productive." *Id.* at 6. "In light of strong Q4 results," Trados and Western Tech agreed to extend the deadline for Trados to draw the second tranche of the venture debt from March to September. *Id.* at 24. Campbell expected good results for the first quarter of 2005 as well, anticipating that Trados would achieve revenue of $7.1 million and do so "profitably." *Id.* at 18.

Campbell then presented his stand-alone business plan for 2005–2007. He estimated the total size of the translation software market in 2004 at $170 million and Trados's "Addressable Software" market at $65 million. JX 309 at 35747. Campbell

judged that Trados owned a 73% share of the desktop segment, a 58% share of the language services segment, and a 26% share of the enterprise segment. Campbell believed the bulk of Trados's addressable market—$45 million—was in enterprise software, which gave Trados some room for growth. To increase growth further, Campbell planned to reposition Trados as the dominant vendor in what he labeled the Global Information Solutions ("GIS") market, which was Campbell's shorthand for the translation aspect of the enterprise content management space. The GIS strategy contemplated enhancing Trados's existing enterprise products to provide content management features while the Company completed Project Genesis. Campbell projected revenue of $30 million in 2005, $38 million in 2006, and $50 million in 2007, all of which assumed flat desktop revenue and growth in the enterprise and GIS segments. Campbell testified that discussion of the business plan lasted "fifteen minutes." Campbell Dep. II 61. During depositions, the VC directors and Prang could not recall considering it. *See* Scanlan Dep. 129–30; Gandhi Dep. II 92–93; Stone Dep. 118–19; Prang Dep. 116. There was zero interest in funding it. *See e.g.*, Tr. 705 (Stone).

Campbell then updated the Board on the M & A efforts: (i) SDL had made "an updated working offer in January," (ii) a merger with Bowne would "have to wait 6–9 months," and (iii) a merger with Lionbridge would be "possible later in the year but not likely at as high a valuation as SDL." JX 291 at 4; JX 318 at 21; JX 319 at 00016. The Board authorized Campbell to contact Lancaster and "put a bar out there to say, look, we're not going to agree on this, ... unless you are thinking in terms of a 60–plus number . . . ." Campbell Dep. I 85.

On February 11, 2005, Campbell and Lancaster met, and Campbell conveyed the $60 million price. After balking initially, Lancaster agreed. The consideration would be $50 million in cash and $10 million in SDL stock. To make the price more palatable for his board, Lancaster asked that Trados pay its legal expenses and JMP's fee out of the sale proceeds. The two executives roughed out a letter of intent (the "LOI").

Campbell shared the news with the Board. Stone sent a positive report to her partners at Hg. *See* JX 310 at 000033 (noting Trados "[m]ade their numbers," "[f]inished the year well—ahead of forecast and profitable," and that "Campbell [was] performing well"). Stone also devoted a page to the forthcoming exit, which detailed the Merger consideration and indicated it would return $15.7–19.2 million to Hg on its investment of approximately $16.6 million. *Id.* at 000038.

On February 14, 2005, Campbell contacted Laidig to find out whether Invision would support the deal. As the most recent investor, Invision was the least out of the money, but also the most reluctant to take a loss. Laidig said Invision would be "fine with a market cap of 60 [million]," which was their pre-money entry price. JX 332.

On February 18, 2005, Budge sent a draft of the LOI to JMP, describing the content as "pretty well baked at this point . . . ." JX 337. Then on February 23, Lancaster put the deal on hold after due diligence revealed Trados's poor performance during the early part of 2004. After a week of inactivity, Budge "pegged the deal odds near zero." JX 357. On March 1, Lancaster reengaged, but Budge still thought the odds were "no better than 40%." *Id.*

On March 29, 2005, Campbell updated the Board on the M & A process and

reported that Bowne was "in play" with Lionbridge as the likely acquirer. JX 365. This combination would remove two of the three most likely purchasers of Trados under Campbell's low risk Merge–Up strategy. It also took away the other component (Bowne) òf the Harvest strategy. From an operational perspective, it meant that one of Trados's major customers (Bowne) would be owned by a company that had been seeking aggressively to compete with Trados (Lionbridge). The deal posed a competitive threat to SDL as well, but to the extent SDL felt compelled to respond with an acquisition of its own, Trados was not its only potential target. In short, the Bowne–Lionbridge development made SDL look like the only opportunity for a near-term exit, with going it alone and the less certain Merge–Up Adjacent strategy as fallbacks.

On April 5, 2005, SDL finally responded with comments to the LOI. The purchase price and structure remained substantially the same. Campbell called a special meeting of the Board to consider the LOI. On April 8, the Board gathered via conference call, reviewed the terms of the deal, and approved it. On April 11, Campbell and Lancaster executed the LOI.

### N. Trados Continues To Perform Well.

Under Campbell's leadership, Trados's fortunes continued to improve. For the first quarter of 2005, the Company brought in revenue of $7.2 million, 26% higher year-over-year and 3% over budget. JX 354. Trados achieved an operating profit of $165,000, and its cash balance exceeded $5 million, beating budget. The GIS repositioning effort was producing results. During the first quarter, the Company issued nine press releases and produced two case studies about enterprise software solutions, and three market analysts issued reports on Trados. For the

quarter, enterprise software sales generated over 50% of revenue. In a report to her partners at Hg, Stone was upbeat: "For the first time, the business is ahead of budget in all key areas and has a seemingly good pipeline. Q1 was a record quarter and the business has made a profit." JX 393 at 000051. Equally important, the "[e]xit" remained "on track." *Id.*

During the second quarter of 2005, Trados continued performing. The Company again would have met its budget and shown a profit, except that Campbell and Budge agreed with Lancaster to delay shipping any new copies of Trados 7, the latest version of its desktop program, until after the Merger closed. The revenue manipulation allowed SDL to book the sales during the third quarter, post-Merger. The increased revenue for the third quarter helped Lancaster by making the acquisition immediately accretive for SDL.

During the same period, Lancaster agreed that Campbell would become President and Chief Strategy Officer of SDL. Campbell also would join SDL's board.

### O. The Merger Is Approved And Closes.

On June 9, 2005, Trados's compensation committee (consisting of Gandhi, Scanlan, and Stone) approved a $250,000 bonus for Campbell and a $150,000 bonus for Budge. The bonuses were given for exemplary performance, including "[y]ear over year revenue growth exceeding market growth," "forecast profitability" for the second quarter of 2005, and "[c]reation of three viable exit strategies for the Company." JX 456.

On June 15, 2005, the Board met to approve the Merger. Under the MIP, the first 13% of the $60 million proceeds ($7.8 million) went to Campbell, Hummel, Budge, and other employees. Campbell's share of the MIP was 30% ($2.34 million). JX 379. During the Merger negotiations,

SDL insisted that Campbell enter into a non-competition agreement, but SDL would not dig any further into its pockets to compensate him for it. To preserve the deal, Campbell agreed to the non-compete. For reasons that were not clearly developed at trial, but which I suspect are tax-related, Campbell recharacterized $1.315 million of his MIP payment as compensation for his non-competition agreement. *See* JX 465 at 45286. He likewise allocated $250,000 of his MIP proceeds to his bonus, which appears to have been another accommodation to keep the deal on track. As a result, Campbell nominally received only $775,000 from the MIP. *See id.* at 45285–86 (allocating Campbell's $2.34 million MIP payment). Unlike Campbell, Hummel demanded compensation for his non-competition agreement. His share of the MIP was duly increased from 12% to 14%. *See* JX 379. Hummel received $1.092 million from the MIP. *See* JX 465 at 45285.

At the time of the Merger, the total liquidation preference on the preferred stock was $57.9 million, including accumulated dividends. JX 465 at 45283–84. The proceeds remaining after the MIP payments—approximately $52.2 million—went to satisfy the liquidation preference. *See id.* at 45283. Each of the preferred stockholders received less than their full liquidation preference but more than their initial investment. The amounts recovered by the entities affiliated with the directors are shown in the following table:

| Preferred Stockholder | Investment in Preferred and Common (ex-dividends) | Allocated Merger Proceeds | Gain |
|---|---|---|---|
| Hg | $16.6 million | $18.9 million | $2.3 million |
| Wachovia | $6.0 million | $8.1 million | $2.1 million |
| Invision | $4.0 million | $4.3 million | $0.3 million |
| Sequoia | $3.8 million | $4.4 million | $0.6 million |
| Mentor | $191,209 | $220,633 | $29,424 |

As events turned out, the preferred stockholders actually received somewhat less. Under the Merger agreement, approximately $4 million of the consideration was set aside in escrow to address indemnification claims. Only $968,000 from the escrow was dispersed to the preferred stockholders, leaving them with total proceeds of $49.2 million. The common stockholders received nothing.

At the June 15, 2005 meeting, the Board determined that the Merger was "advisable and in the best interests of the Company and its stockholders" and formally "authorized, adopted and approved" it. JX 470 at 50853. The Board also approved and recommended to stockholders an amendment to the Company's certificate of incorporation that reset the liquidation preferences of the preferred stock at the specific amounts they would receive in the Merger.

All that remained were the necessary stockholder approvals, one by the preferred and one by the common. Trados management anticipated getting both votes handily, as shown by the following table that Budge prepared and Campbell sent to Lancaster:

| Shareholder | % of Preferred | % of Total |
|---|---|---|

**Large Friendlies:**

| | | |
|---|---|---|
| Hg Capital | 23.2% | 14.1% |
| Sequoia | 14.9% | 7.7% |
| Wachovia | 13.2% | 6.8% |
| Adastra | 7.7% | 4.0% |
| Invision | 13.5% | 7.0% |
| Industry Ventures | 3.4% | 1.8% |
| Mitsui | 4.0% | 2.1% |
| Jochen [Hummel] | 0.0% | 11.9% |
| Total Large Friendlies | 79.9% | 55.4% |
| Required Percentage | 61.0% | 50.0% |

JX 419; *see* JX 422 (Campbell forwarding to Lancaster).

On June 17, 2005, Trados's stockholders approved the Merger. Microsoft abstained, advising Campbell that "the economic result from the perspective of our equity interest is not such that we are prepared to actively vote in favor . . . ." JX 513.

## P. The Plaintiff Sues.

Plaintiff Marc Christen owned about 5% of Trados's common stock. On July 21, 2005, he sought appraisal for his 1,753,298 shares.

Discovery in the appraisal action did not proceed smoothly. Christen was forced to file several motions to compel, and Trados's representations that it had completed its document production were repeatedly proven incorrect. During the appraisal action, Christen deposed Campbell, Gandhi, McClelland, Budge, Knyphausen, and Kevin Passarello, who was Trados's general counsel. Christen also defeated a motion for summary judgment.

On July 3, 2008, based on discovery from the appraisal action, Christen filed a second lawsuit, individually and on behalf of a class of Trados's common stockholders, alleging that the former Trados directors breached their duty of loyalty by approving the Merger. After the actions were consolidated, the defendants moved to dismiss the new claims and obtained a stay of discovery in both actions pending the outcome of the motion. With one exception, Chancellor Chandler denied the motion. *See In re Trados Inc. S'holder Litig.* (*Trados I* ), 2009 WL 2225958 (Del.Ch. July 24, 2009). The exception was a claim that Campbell and Hummel manipulated Trados's shipments to benefit SDL by increasing post-Merger revenue, and that SDL and two of its principals aided and abetted this breach of duty. The Chancellor dismissed the revenue manipulation claims because the amended complaint did not adequately plead any material benefit to Campbell or Hummel. *Id.* at *9–10. The evidence of revenue manipulation remained relevant to the value of Trados at the time of the Merger and to the defendants' credibility. It is quite clear that revenue manipulation occurred.[2]

---

**2.** *See* JX 466 (Budge asking Lancaster: "Don't you want to mention that it is available after the deal close date (July 5), so that you get all the revenue that comes with de-layed shipments[?]"); JX 486 (Mike Kidd, one of Trados's executives, reporting to Budge, Hummel, and Campbell that "[t]he delayed shipments of TRADOS 7 is [sic] causing major

In 2010, the action was reassigned to me. In the interim, discovery in the breach of fiduciary duty action had not gone smoothly either. Christen was forced to file a motion to compel, which was granted. Christen also defeated a partial motion for summary judgment. On March 11, 2011, I certified a class "consist[ing] of all beneficial owners of Trados, Inc.'s common stock whose shares were extinguished by a merger on July 7, 2005, with the exception of defendants ...." Dkt. 213. At the close of discovery, the defendants again moved for summary judgment. After the motion was denied, the case proceeded to trial.

## II. LEGAL ANALYSIS

Since *Cede & Co. v. Technicolor, Inc.* (*Technicolor I*), 542 A.2d 1182 (Del.1988), the consolidated breach of fiduciary duty action and appraisal proceeding has been a fixture of Delaware law. The breach of fiduciary duty claim seeks an equitable remedy that requires a finding of wrongdoing. The appraisal proceeding seeks a statutory determination of fair value that does not require a finding of wrongdoing. In *Technicolor I*, the Delaware Supreme Court stated that when presented with such a case, the court should address the breach of fiduciary duty action first, because a finding of liability and the resultant remedy could moot the appraisal proceeding. *Id.* at 1188. Consistent with the Delaware Supreme Court's instructions, this decision starts with the plaintiff's claim for breach of fiduciary duty, then turns to the appraisal. It also considers the plaintiff's request for leave to file an application for fee shifting under the bad faith exception to the American Rule.

## A. The Breach Of Fiduciary Duty Claim

When determining whether directors have breached their fiduciary duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review. *See* William T. Allen, Jack B. Jacobs, & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of Van Gorkom and its Progeny as a Standard of Review Problem*, 96 Nw. U.L.Rev. 449, 451–52 (2002) [hereinafter *Realigning the Standard*]. The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors

customer service issues. Customers are clogging our emails and phones wanting to know where their [Trados 7 updates] are"); JX 507 (Budge stating he expects to have "$1.9m in deferred software revenue to deliver to SDL," which "[w]ill be close to the $2m we promised."); JX 518 (Budge drafting an email from Campbell to Lancaster: "As we've discussed on many occasions, we did not ship certain revenues for the last couple weeks of the quarter, the total of which is $2,046k. This $2,046k in business will be shipped after the deal is substantially closed which is hopefully today and the result will be $2m+ of revenue and profit immediately for SDL."). The evidence at trial established that SDL made a bet-the-company decision when purchasing Trados. SDL was a public company, and the success of the Merger had major implications for the trading price of its stock. Delaying the revenue made the deal immediately accretive to SDL. Campbell took a portion of his MIP payout in the form of SDL shares worth approximately $700,000. JX 465 at 45285. He sold the shares within 90–120 days after the Merger for about $900,000. Tr. 9. The preferred stockholders also took a portion of the Merger consideration in the form of SDL shares. Had these facts been alleged sufficiently, it might have been reasonably conceivable for pleading purposes that the revenue manipulation benefitted the defendants. The plaintiff has not sought to revisit that aspect of *Trados I*, which is law of the case.

have met the standard of conduct. It describes what a plaintiff must first plead and later prove to prevail.

■ Under Delaware law, the standard of review depends initially on whether the board members (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness). The standard of review may change further depending on whether the directors took steps to address the potential or actual conflict, such as by creating an independent committee, conditioning the transaction on approval by disinterested stockholders, or both. Regardless, in every situation, the standard of review is more forgiving of directors and more onerous for stockholder plaintiffs than the standard of conduct. This divergence is warranted for diverse policy reasons typically cited as justifications for the business judgment rule. *See, e.g., Brehm v. Eisner*, 746 A.2d 244, 263 (Del.2000) (explaining justifications for business judgment rule).

## 1. The Standard Of Conduct

■ Delaware corporate law starts from the bedrock principle that "[t]he business and affairs of every corporation ... shall be managed by or under the direction of a board of directors." 8 *Del. C.* § 141(a). When exercising their statutory responsibility, the standard of conduct requires that directors seek "to promote the value of the corporation for the benefit of its stockholders." [3]

"It is, of course, accepted that a corporation may take steps, such as giving charitable contributions or paying higher wages, that do not maximize profits currently. They may do so, however, because such activities are rationalized as producing greater profits over the long-term." Leo E. Strine, Jr., *Our Continuing Struggle with the Idea that For–Profit Corporations Seek Profit*, 47 Wake Forest L.Rev. 135, 147 n. 34 (2012) [hereinafter *For–Profit Corporations*]. Decisions of this nature benefit the corporation as a whole, and by increasing the value of the corporation, the directors increase the share of value available for the residual claimants. Judicial opinions therefore often refer to directors owing fiduciary duties "to the corporation and its shareholders." *Gheewalla*, 930 A.2d at 99; *accord Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del.1989) ("[D]irectors owe fiduciary duties of care and loyalty to the corporation and its shareholders ...."); *Polk v. Good*, 507 A.2d 531, 536 (Del.1986) ("In performing their duties the directors owe fundamental fiduciary duties of loyalty and care to the corporation and its shareholders."). This formulation captures the foundational relationship in which directors owe duties to the corporation for

---

3. *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del.Ch.2010); *accord N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del.2007) ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder[ ] owners."); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del.1985) (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders"); *see also* Leo E. Strine, Jr., et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 634 (2010) ("[I]t is essential that directors take their responsibilities seriously by actually trying to manage the corporation in a manner advantageous to the stockholders.").

the ultimate benefit of the entity's residual claimants. Nevertheless, "stockholders' best interest must always, within legal limits, be the end. Other constituencies may be considered only instrumentally to advance that end." *For–Profit Corporations, supra,* at 147 n. 34.

 A Delaware corporation, by default, has a perpetual existence. 8 *Del. C.* §§ 102(b)(5), 122(1). Equity capital, by default, is permanent capital.[4] In terms of the standard of conduct, the duty of loyalty therefore mandates that directors maxim-

ize the value of the corporation over the long-term for the benefit of the providers of equity capital, as warranted for an entity with perpetual life in which the residual claimants have locked in their investment.[5] When deciding whether to pursue a strategic alternative that would end or fundamentally alter the stockholders' ongoing investment in the corporation, the loyalty-based standard of conduct requires that the alternative yield value exceeding what the corporation otherwise would generate for stockholders over the long-term.[6] Val-

---

4. *See* 8 *Del. C.* § 160 (imposing restrictions on the ability of a Delaware corporation to redeem its own shares); *SV Inv. P'rs, LLC v. ThoughtWorks, Inc.,* 7 A.3d 973, 983–88 (Del. Ch.2010) (interpreting charter provision requiring redemption of preferred stock out of "funds legally available" in light of restrictions on redemption imposed by statute and common law), *aff'd,* 37 A.3d 205 (Del.2011). *See generally* Lynn A. Stout, *On the Nature of Corporations,* 2005 U. Ill. L.Rev. 253 (2005) (exploring implications of equity capital lock-in); Margaret M. Blair, *Locking in Capital: What Corporate Law Achieved for Business Organizers in the Nineteenth Century,* 51 UCLA L.Rev. 387 (2003) (tracing history of equity capital lock-in); Edward B. Rock & Michael L. Wachter, *Waiting for the Omelet to Set: Match–Specific Assets and Minority Oppression in Close Corporations,* 24 J. Corp. L. 913 (1999) (describing costs and benefits of equity capital lock-in). Shares, by default, are freely alienable. *See* 8 *Del. C.* § 202. Alienability ameliorates the effects of capital lock-in by enabling exit, but it does not alter the presumptively permanent status of equity capital. Selling simply substitutes a new owner as the holder of the bundle of rights associated with the equity. The capital remains locked in. In a publicly traded company, the successor holder's ownership status is even more attenuated: since the implementation of the SEC's policy of share immobilization, public stockholders do not own shares; they own the contract right to acquire record ownership and the equitable rights associated with beneficial ownership. *See Kurz v. Holbrook,* 989 A.2d 140, 161–62, 167–69 (Del.Ch. 2010), *aff'd in part, rev'd in part on other grounds,* 992 A.2d 377 (Del.2010).

5. *See, e.g., Gantler v. Stephens,* 965 A.2d 695, 706 (Del.2009) (holding that "enhancing the corporation's long term share value" is a "distinctively corporate concern[ ]"); *TW Servs. v. SWT Acq. Corp.,* 1989 WL 20290, at *7 (Del.Ch. Mar. 2, 1989) (Allen, C.) (describing as "non-controversial" the proposition that "the interests of the shareholders as a class are seen as congruent with those of the corporation in the long run" and explaining that "[t]hus, broadly, directors may be said to owe a duty to shareholders as a class to manage the corporation within the law, with due care and in a way intended to maximize the long run interests of shareholders"); Andrew A. Schwartz, *The Perpetual Corporation,* 80 G. Wash. L.Rev. 764, 777–83 (2012) (arguing that the corporate attribute of perpetual existence calls for a fiduciary mandate of long-term value maximization for the stockholders' benefit); William T. Allen, *Ambiguity in Corporation Law,* 22 Del. J. Corp. L. 894, 896–97 (1997) ("[I]t can be seen that the proper orientation of corporation law is the *protection of long-term value of capital* committed indefinitely to the firm.").

6. *Compare Paramount Commc'ns Inc. v. QVC Network Inc.,* 637 A.2d 34, 44 (Del.1994) (holding it was reasonably probable that directors breached their fiduciary duties by pursuing ostensibly superior value to be created by long-term strategic combination when, post-transaction, a controller would have "the power to alter that vision," rendering its value highly contingent), *and Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.,* 506 A.2d 173, 182 (Del.1986) (holding that alternative of maintaining corporation as stand-alone entity and use of defensive measures to preserve

ue, of course, does not just mean cash. It could mean an ownership interest in an entity, a package of other securities, or some combination, with or without cash, that will deliver greater value over the anticipated investment horizon. *See QVC*, 637 A.2d at 44 (describing how directors should approach consideration of non-cash or mixed consideration).

The duty to act for the ultimate benefit of stockholders does not require that directors fulfill the wishes of a particular subset of the stockholder base. *See In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 655 (Del.Ch.2008) ("Directors are not thermometers, existing to register the ever-changing sentiments of stockholders.... During their term of office, directors may take good faith actions that they believe will benefit stockholders, even if they realize that the stockholders do not agree with them."); *Paramount Commc'ns Inc. v. Time Inc.*, 1989 WL 79880, at *30 (Del.Ch. July 14, 1989) ("The corporation law does not operate on the theory that directors, in exercising their powers to manage the firm, are obligated to follow the wishes of a majority of shares. In fact, directors, not shareholders, are charged with the duty to manage the firm."), *aff'd in pertinent part, Time*, 571 A.2d at 1150; *TW Servs.*, 1989 WL 20290, at *8 n. 14 ("While corporate democracy is a pertinent concept, a corporation is not a New England town meeting; directors, not shareholders, have responsibilities to manage the business and affairs of the corporation, subject however to a fiduciary obligation."). Stockholders may have idiosyncratic reasons for preferring decisions that misallocate capital. Directors must exercise their independent fiduciary judgment; they need not cater to stockholder whim. *See Time*, 571 A.2d at 1154 ("Delaware law confers the management of the corporate enterprise to the stockholders' duly elected board representatives. The fiduciary duty to manage a corporate enterprise includes the selection of a time frame for achievement of corporate goals. That duty may not be delegated to the stockholders." (citations omitted)).

More pertinent to the current case, a particular class or series of stock may hold contractual rights against the corporation and desire outcomes that maximize the value of those rights. *See MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *6 (Del.Ch. May 5, 2010) (noting that preferential contract rights may appear in "the articles of incorporation, the preferred share designations, or some other appropriate document" such as a registration rights agreement, investor rights agreement, or stockholder agreement). By default, "all stock is created equal." *Id.* Unless a corporation's certificate of incorporation provides otherwise, each share of stock is common stock. If the certificate of incorporation grants a particular class or series of stock special "voting powers, ... designations, preferences and

<hr>

that alternative "became moot" once board determined that values achievable through a sale process exceeded board's assessment of stand-alone value), *with Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1154 (Del.1989) (holding it was not reasonably probable that directors breached their fiduciary duties by pursuing superior long-term value of strategic, stock-for-stock merger without a post-transaction controller), *Unocal*, 493 A.2d at 956 (holding it was not reasonably probable that directors breached

their fiduciary duties by adopting a selective exchange offer to defend against a two-tiered tender offer where blended value of offer was less than $54 per share and board reasonably believed stand-alone value of corporation was much greater), *and Air Prods. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48, 108–09 (Del.Ch. 2011) (holding that board complied with fiduciary duties by maintaining a rights plan to protect higher stand-alone value of corporation rather than permit immediate sale).

relative, participating, optional or other special rights" superior to the common stock, then the class or series holding the rights is known as preferred stock. 8 *Del. C.* § 151(a); *see Starring v. Am. Hair & Felt Co.*, 191 A. 887, 890 (Del.Ch.1937) (Wolcott, C.) ("The term 'preferred stock' is of fairly definite import. There is no difficulty in understanding its general concept. [It] is of course a stock which in relation to other classes enjoys certain defined rights and privileges."), *aff'd*, 2 A.2d 249 (Del.1937). If the certificate of incorporation is silent on a particular issue, then as to that issue the preferred stock and the common stock have the same rights.[7] Consequently, as a general matter, "the rights and preferences of preferred stock are contractual in nature." *Trados I*, 2009 WL 2225958, at *7; *accord Judah v. Del. Trust Co.*, 378 A.2d 624, 628 (Del.1977) ("Generally, the provisions of the certificate of incorporation govern the rights of preferred shareholders, the certificate of incorporation being interpreted in accordance with the law of contracts, with only those rights which are embodied in the certificate granted to preferred shareholders.").[8]

A board does not owe fiduciary duties to preferred stockholders when considering whether or not to take corporate action that might trigger or circumvent the preferred stockholders' contractual rights.[9] Preferred stockholders are owed fiduciary

---

7. *See* 8 *Del. C.* § 151(a); *MCG Capital*, 2010 WL 1782271, at *6 ("Where there is an affirmative expression altering the rights of a class of stock, only those specific rights are altered, other default rights remain unaltered."); *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 593–94 (Del.Ch.1986) (Allen, C.) ("If a certificate designating rights, preferences, etc. of special stock contains *no* provision dealing with voting rights or *no* provision creating rights upon liquidation, it is not the fact that such stock has no voting rights or no rights upon liquidation. Rather, in such circumstances, the preferred stock has the same voting rights as common stock or the same rights to participate in the liquidation of the corporation as has such stock." (citations omitted)); *see also Matulich v. Aegis Commc'ns Gp., Inc.*, 942 A.2d 596, 600 (Del.2008) ("If a certificate of designation is silent as to voting rights, preferred shareholders have the same statutory rights as common stockholders."). *See generally* Richard M. Buxbaum, *The Internal Division of Powers in Corporate Governance*, 73 Cal. L.Rev. 1671, 1684 (1985) ("Whatever its attributes (its 'rights, preferences, and privileges,' in the jargon), preferred stock is quintessentially a matter of contract. If any deviation from the attributes of the residual common stock concept is desired, the contract must specify it.").

8. The primacy of the negotiated contract should not be overstated: preferred stock is senior in defined respects to common, but it is equity, not debt, and it remains subject to the

statutory and common law limitations that apply to equity. *See Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 645 (Del.Ch.2013) ("By investing in preferred stock, the defendants contracted for equity treatment, received the attendant benefits, and accepted the concomitant limitations, including restrictions like those found in Section 160."); *SV Inv. P'rs*, 7 A.3d at 983–88 (applying statutory and common law restrictions on preferred stock redemption right).

9. *See Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del.1969) (holding that former preferred stockholders who received debentures and a share of common stock were not owed fiduciary duties in their capacity as debenture holders and had only their contractual rights as creditors); *LC Capital Master Fund, Ltd. v. James*, 990 A.2d 435, 437 (Del. Ch.2010) ("[O]nce the QuadraMed Board honored the special contractual rights of the preferred, it was entitled to favor the interests of the common stockholders."); *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 2173838, at *7 (Del.Ch. May 28, 2010) ("[R]ights arising from documents governing a preferred class of stock, such as the Certificates, that are enjoyed solely by the preferred class, do not give rise to fiduciary duties because such rights are purely contractual in nature."); *MCG Capital*, 2010 WL 1782271, at *15 ("[D]irectors do not owe preferred shareholders any fiduciary duties with respect to [their contractual] rights."); *Jedwab*, 509

duties only when they do not invoke their special contractual rights and rely on a right shared equally with the common stock. Under those circumstances, "the existence of such right and the correlative duty may be measured by equitable as well as legal standards." [10] Thus, for example, just as common stockholders can challenge a disproportionate allocation of merger consideration,[11] so too can preferred stockholders who do not possess and are not limited by a contractual entitlement.[12] Under those circumstances, the decision to allocate different consideration is a discretionary, fiduciary determination that must pass muster under the appropriate standard of review, and the degree to which directors own different classes or series of stock may affect the standard of review.[13]

■ To reiterate, the standard of conduct for directors requires that they strive

A.2d at 594 ("[W]ith respect to matters relating to the preferences or limitations that distinguish preferred stock from common, the duty of the corporation and its directors is essentially contractual ...."); see also Simons v. Cogan, 549 A.2d 300, 303 (Del.1988) ("[A] convertible debenture represents a contractual entitlement to the repayment of a debt and does not represent an equitable interest in the issuing corporation necessary for the imposition of a trust relationship with concomitant fiduciary duties."); Revlon, 506 A.2d at 182 ("[T]he Revlon board could not make the requisite showing of [fiduciary] good faith by preferring the noteholders and ignoring its duty of loyalty to the shareholders. The rights of the former already were fixed by contract.").

10. Jedwab, 509 A.2d at 594; accord LC Capital, 990 A.2d at 449–50; MCG Capital, 2010 WL 1782271, at *15; Trados I, 2009 WL 2225958, at *7; Rosan v. Chi. Milwaukee Corp., 1990 WL 13482, at *6 (Del.Ch. Feb. 6, 1990).

11. See, e.g., In re Delphi Fin. Gp. S'holder Litig., 2012 WL 729232, at *12 n. 57 (Del.Ch. Mar. 6, 2012) (considering challenge by common stockholders to transaction in which controlling stockholder received differential merger consideration); N.J. Carpenters Pension Fund v. Infogroup, Inc., 2011 WL 4825888, at *9 (Del.Ch. Sept. 30, 2011) (same); In re John Q. Hammons Hotels Inc. S'holder Litig., 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009) (same); In re Tele–Commc'ns, Inc. S'holders Litig., 2005 WL 3642727, at *7 (Del.Ch. Dec. 21, 2005) (considering challenge to merger in which "a clear and significant benefit of nearly $300 million accrued primarily" to directors holding high-vote common stock (footnote omitted)); In re LNR Prop. Corp. S'holders Litig., 896 A.2d 169, 178 (Del.Ch.2005) (considering challenge by common stockholders to transaction in which corporation was sold to third party but controlling stockholder received right to roll equity in transaction).

12. See, e.g., In re FLS Hldgs., Inc. S'holders Litig., 1993 WL 104562, at *5 (Del.Ch. Apr. 2, 1993) (rejecting disclosure-only settlement of claims challenging merger in which all consideration went to the common stockholders and the preferred stockholders received nothing, holding that board comprised of directors holding common stock would likely bear the burden of proving that allocation of consideration was entirely fair, and noting that absence of independent bargaining agent or other meaningful procedural protections for the preferred made fairness "a substantial issue that is fairly litigable"); Jedwab, 509 A.2d at 595 (holding that preferred stockholder could challenge controller's allocation of merger consideration between preferred and common but concluding that the defendants were likely to meet their burden).

13. See Tele–Commc'ns, 2005 WL 3642727, at *7 (considering directors' relative ownership of high-vote and low-vote stock in evaluating their interest in transaction that paid premium for high-vote shares and holding that entire fairness applied because of directors' disproportionate ownership of high-vote shares); In re Staples, Inc. S'holders Litig., 792 A.2d 934, 950–51 (Del.Ch.2001) (considering directors' ownership of tracking stock in evaluating interestedness and applying business judgment rule because the directors' ownership stakes did not give rise to a material conflict of interest); In re Gen. Motors Class H S'holders Litig., 734 A.2d 611, 617–18 (Del.Ch.1999) (same); Solomon v. Armstrong, 747 A.2d 1098, 1117–18 (Del.Ch.1999) (same).

in good faith and on an informed basis to maximize the value of the corporation for the benefit of its residual claimants, the ultimate beneficiaries of the firm's value, not for the benefit of its contractual claimants.[14] In light of this obligation, "it is the duty of directors to pursue the best interests of the corporation and its common stockholders, if that can be done faithfully with the contractual promises owed to the preferred." *LC Capital,* 990 A.2d at 452. Put differently, "generally it will be the duty of the board, where discretionary judgment is to be exercised, to prefer the interests of the common stock—as the good faith judgment of the board sees them to be—to the interests created by the special rights, preferences, *etc* .... of preferred stock." *Equity–Linked,* 705 A.2d at 1042. This principle is not unique to preferred stock; it applies equally to other holders of contract rights against the corporation.[15] Consequently, as this court

**14.** *See LC Capital,* 990 A.2d at 449–50 (holding that the board's duties required the board "to take reasonable efforts to secure the highest price reasonably available for the corporation" and rejecting argument that board had a duty to maximize the value of a liquidation preference and other contractual rights in the certificate of designations governing preferred stock); *Equity–Linked Investors, L.P. v. Adams,* 705 A.2d 1040, 1042 (Del.Ch.1997) (Allen, C.) (declining to enjoin debt issuance that "was taken for the benefit largely of the common stock," that imposed "economic risks upon the preferred stock which the holders of the preferred did not want," but that did not violate their contractual preferences); *HB Korenvaes Invs., L.P. v. Marriott Corp.,* 1993 WL 205040, at *3–5 (Del.Ch. Apr. 2, 1993) (Allen, C.) (declining to enjoin planned spinoff of businesses to common stock and indefinite suspension of dividends on preferred stock on grounds that directors did not violate any contractual rights of the preferred stock). "Consistent with this viewpoint, it has been thought that having directors who actually owned a meaningful, long-term common stock stake was a useful thing, because that would align the interests of the independent directors with the common stockholders and give [the directors] a personal incentive to fulfill their duties effectively." *LC Capital,* 990 A.2d at 452.

**15.** *See Gheewalla,* 930 A.2d at 101 ("When a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners."); *Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.,* 863 A.2d 772, 790 (Del.Ch.

2004) ("Having complied with all legal obligations owed to the firm's creditors, the board would ... ordinarily be free to take economic risk for the benefit of the firm's equity owners, so long as the directors comply with their fiduciary duties to the firm by selecting and pursuing with fidelity and prudence a plausible strategy to maximize the firm's value."); *Blackmore P'rs, L.P. v. Link Energy LLC,* 864 A.2d 80, 85–86 (Del.Ch.2004) ("[T]he allegation that the Defendant Directors approved a sale of substantially all of [the company's] assets and a resultant distribution of proceeds that went exclusively to the company's creditors raises a reasonable inference of disloyalty or intentional misconduct. Of course, it is also possible to infer (and the record at a later stage may well show) that the Director Defendants made a good faith judgment, after reasonable investigation, that there was no future for the business and no better alternative .... [I]t would appear that no transaction could have been worse for the unit holders and reasonable to infer ... that a properly motivated board of directors would not have agreed to a proposal that wiped out the value of the common equity and surrendered all of that value to the company's creditors."); *see also Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 191–98 (Del.Ch.2006) (applying business judgment rule to dismiss claims that directors of solvent corporation breached their duties by taking action to benefit subsidiary's sole stockholder at the expense of its creditors), *aff'd,* 931 A.2d 438 (Del.2007). Even when a corporation is insolvent, creditors lack standing to assert a direct claim for breach of fiduciary duty; they merely gain standing to sue derivatively because they have joined the ranks of the residual claimants. *See Gheewalla,* 930 A.2d at 101 ("When a corporation is

observed at the motion to dismiss stage, "in circumstances where the interests of the common stockholders diverge from those of the preferred stockholders, it is *possible* that a director could breach her duty by improperly favoring the interests of the preferred stockholders over those of the common stockholders." *Trados I,* 2009 WL 2225958, at *7; *accord LC Capital,* 990 A.2d at 447 (quoting *Trados I* and remarking that it "summarized the weight of authority very well").[16]

In this case, the directors made the discretionary decision to sell Trados in a transaction that triggered the preferred stockholders' contractual liquidation preference, a right that the preferred stock-

holders otherwise could not have exercised. The plaintiff contends that the Board should not have agreed to the Merger and had a duty to continue operating Trados on a stand-alone basis, because that alternative had the potential to maximize the value of the corporation for the ultimate benefit of the common stock. The Trados directors, of course, contend that they complied with their fiduciary duties.

## 2. The Standards Of Review

To determine whether directors have met their fiduciary obligations, Delaware courts evaluate the challenged decision

*insolvent,* however, its creditors take the place of the shareholders as the residual beneficiaries of any increase in value. Consequently, the creditors of an *insolvent* corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties.").

16. Some scholars have interpreted *Orban v. Field,* 1997 WL 153831 (Del.Ch. Apr. 1, 1997) (Allen, C.), as supporting a "control-contingent approach" in which a board elected by the common stock owes duties to the common stockholders but not the preferred stock, but a board elected by the preferred stock can promote the interests of the preferred stock at the expense of the common stock. *See, e.g.,* Jesse M. Fried & Mira Ganor, *Agency Costs of Venture Capitalist Control in Startups,* 81 N.Y.U. L.Rev. 967, 990–93 (2006) [hereinafter *Agency Costs* ]. The control-contingent interpretation does not comport with how I understand the role of fiduciary duties or the ruling in *Orban,* which I read as a case in which the common stock had no economic value such that a transaction in which the common stockholders received nothing was fair to them. *See infra* note 48. Some scholars also have argued that in lieu of a common stock valuation maximand, directors should have a duty to maximize enterprise value, defined in the common-preferred context as the aggregate value of the returns to the common stock plus the preferred stock, taking into account the preferred stock's contractual rights. *See, e.g.,* William W. Bratton & Michael L. Wachter, *A*

*Theory of Preferred Stock,* 161 U. Pa. L.Rev. 1815, 1885–86 (2013) [hereinafter *Theory of Preferred* ]; Douglas G. Baird & M. Todd Henderson, *Other People's Money,* 60 Stan. L.Rev. 1309, 1323–28 (2008). Among other problems, such an approach does not explain why the duty to maximize enterprise value should encompass certain contract rights (those of preferred) but not others (those of creditors, employees, pensioners, customers, etc.). Moreover, while tolerably clear in the abstract and sometimes in real-world settings, *see, e.g., In re Central Ice Cream Co.,* 836 F.2d 1068 (7th Cir.1987), the enterprise value standard ultimately complicates rather than simplifies the difficult judgments faced by directors acting under conditions of uncertainty and the task confronted by courts who must review their decisions. The enterprise value standard compounds the number of valuation alternatives that must be solved simultaneously, and the resulting multivariate fiduciary calculus quickly devolves into the equitable equivalent of a constituency statute with a concomitant decline in accountability. Delaware case law as I read it does not support the enterprise value theory. As long as a board complies with its legal obligations, the standard of fiduciary conduct calls for the board to maximize the value of the corporation for the benefit of the common stock. *See LC Capital,* 990 A.2d at 452 ("[I]t is the duty of directors to pursue the best interests of the corporation and its common stockholders, if that can be done faithfully with the contractual promises owed to the preferred ....").

through the lens of a standard of review. In this case, the Board lacked a majority of disinterested and independent directors, making entire fairness the applicable standard.

■■■■ "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del.Ch.2011). Delaware's default standard of review is the business judgment rule. The rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[17] This standard of review "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation." *Trados I*, 2009 WL 2225958, at *6. Unless one of its elements is rebutted, "the court merely looks to see whether the business decision made was rational in the sense of being one

logical approach to advancing the corporation's objectives." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del.Ch. 2010). Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty.[18]

■■■■ Enhanced scrutiny is Delaware's intermediate standard of review. Framed generally, it requires that the defendant fiduciaries "bear the burden of persuasion to show that their motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective." *Mercier v. Inter–Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del.Ch. 2007). Enhanced scrutiny applies to specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors. In *Unocal*, the Delaware Supreme Court created enhanced scrutiny to address the potential conflicts of interest faced by a board of directors

17. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). In *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del.2000), the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *Id.* at 253 n. 13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72–73 (Del.1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n. 15 (Del.1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del.1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del.1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del.1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Brehm*, 746 A.2d at 254. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review and therefore omits the cumbersome subsequent history.

18. *See Realigning the Standard*, *supra*, at 452 (defining an irrational decision as "one that is so blatantly imprudent that it is inexplicable, in the sense that no well-motivated and minimally informed person could have made it"); *see also Brehm*, 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780–81 (Del.Ch.1988) ("A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.").

when resisting a hostile takeover, namely the "omnipresent specter" that target directors may be influenced by and act to further their own interests or those of incumbent management, "rather than those of the corporation and its shareholders." 493 A.2d at 954. Tailored for this context, enhanced scrutiny requires that directors who take defensive action against a hostile takeover show (i) that "they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed," and (ii) that the response selected was "reasonable in relation to the threat posed." *Id.* at 955.

In *Revlon,* the Delaware Supreme Court extended the new intermediate standard to the sale of a corporation. *See* 506 A.2d at 180–82 (expressly applying *Unocal* test). Here too, enhanced scrutiny applies because of the potential conflicts of interest that fiduciaries must confront. "[T]he potential sale of a corporation has enormous implications for corporate managers and advisors, and a range of human motivations, including but by no means limited to greed, can inspire fiduciaries and their advisors to be less than faithful." *In re El Paso Corp. S'holder Litig.,* 41 A.3d 432, 439 (Del.Ch.2012). These potential conflicts warrant a more searching standard of review than the business judgment rule:

> The heightened scrutiny that applies in the *Revlon* (and *Unocal*) contexts are, in large measure, rooted in a concern that the board might harbor personal motivations in the sale context that differ from what is best for the corporation and its stockholders. Most traditionally, there is the danger that top corporate managers will resist a sale that might cost them their managerial posts, or prefer a sale to one industry rival rather than another for reasons having more to do with personal ego than with what is best for stockholders.

*Dollar Thrifty,* 14 A.3d at 597 (footnote omitted). Consequently, "the predicate question of what the board's true motivation was comes into play," and "[t]he court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced the board ...." *Id.* at 598. Tailored to the sale context, enhanced scrutiny requires that the defendant fiduciaries show that they acted reasonably to obtain for their beneficiaries the best value reasonably available under the circumstances, which may be no transaction at all. *See QVC,* 637 A.2d at 48–49.

Entire fairness, Delaware's most onerous standard, applies when the board labors under actual conflicts of interest. Once entire fairness applies, the defendants must establish "to the court's satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc. (Technicolor III),* 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.,* 902 A.2d 1130, 1145 (Del.Ch.2006).

To obtain review under the entire fairness test, the stockholder plaintiff must prove that there were not enough independent and disinterested individuals among the directors making the challenged decision to comprise a board majority. *See Aronson,* 473 A.2d at 812 (noting that if "the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application"). To determine whether the directors approving the transaction comprised a disinterested and independent

board majority, the court conducts a director-by-director analysis.[19]

In this case, the plaintiff proved at trial that six of the seven Trados directors were not disinterested and independent, making entire fairness the operative standard. This finding does not mean that the six directors necessarily breached their fiduciary duties, only that entire fairness is the lens through which the court evaluates their actions.

### a. The Management Directors: Campbell And Hummel

Two of the directors—Campbell and Hummel—received personal benefits in the Merger. The plaintiff proved that the benefits were material to them, rendering Campbell and Hummel interested in the decision to approve the Merger.

In *Trados I*, this court recognized that "a director is interested in a transaction if 'he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.' "[20] This court further recognized that for purposes of fiduciary review, "the benefit received by the director and not shared with stockholders must be 'of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director

could perform her fiduciary duties ... without being influenced by her overriding personal interest.' " *Trados I*, 2009 WL 2225958, at *6 (quoting *Gen. Motors Class H.*, 734 A.2d at 617, and citing *Orman*, 794 A.2d at 23).

At trial, the plaintiff proved that Campbell personally received $2.34 million from the MIP, portions of which were recharacterized as a bonus and as payment for his non-competition agreement. Campbell bargained for and obtained post-transaction employment as SDL's President and Chief Strategy Officer. He also became a member of SDL's board, where he earned $50,000 per year for his service (later bumped to $60,000 per year).

During discovery, the plaintiff asked Campbell about his personal wealth to explore materiality. Defense counsel objected, and Campbell initially refused to provide any specifics. He then only agreed to estimate that his net worth at the time was $5–10 million. Defense counsel instructed him not to answer any further questions on the subject. *See* Campbell Dep. II 125–27.

Campbell's post-transaction SDL board membership, standing alone, would not be sufficient to create a disqualifying interest. *See Orman*, 794 A.2d at 28–29. Taken collectively, however, the benefits Camp-

---

**19.** *See McMullin v. Beran*, 765 A.2d 910, 923 (Del.2000) ("In assessing director independence, Delaware courts apply a subjective 'actual person' standard to determine whether a 'given' director was likely to be affected in the same or similar circumstances." (citing *Technicolor III*, 663 A.2d at 1167)); *Cede & Co. v. Technicolor, Inc. (Technicolor II )*, 634 A.2d 345, 361, 364 (Del.1993) (requiring director-by-director analysis); *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del.2006) (affirming director-by-director analysis); *see also Orman v. Cullman*, 794 A.2d 5, 25 n. 50 (Del.Ch.2002) (explaining that materiality is required for a breach of fiduciary duty claim but not for a violation of 8 *Del. C.* § 144).

**20.** *Trados I*, 2009 WL 2225958, at *6 (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)); *accord Technicolor II*, 634 A.2d at 362 ("Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally."); *Pogostin*, 480 A.2d at 624 ("Directorial interest exists whenever ... a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders.").

bell received were material. The payments represented 23% to 47% of his net worth at the time of the Merger and paid him nearly ten times what he would make annually by continuing to manage Trados as a stand-alone entity. *See, e.g., Oliver v. Bos. Univ.*, 2006 WL 1064169, at *27 (Del. Ch. Apr. 14, 2006) ("[The CEO], with significant financial interests of his own, cannot be said to have negotiated for the minority common shareholder because every dollar the minority common shareholder received was likely to reduce the Asset Value Realization Bonus that he would receive as a consequence of the merger."); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 730 (Del.Ch.1999), *aff'd*, 757 A.2d 1278 (Del.2000) (treating inside director as interested in transaction because of personal financial rewards from triggering golden parachute). It is also fair to infer that the payments were material in light of defense counsel's objections and the defendants' failure to produce any countervailing evidence. *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1119 n. 7 (Del.1994) ("[T]he production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse."); *Smith v. Van Gorkom*, 488 A.2d 858, 878–79 (Del.1985).

At trial, the plaintiff similarly proved that Hummel personally received material benefits. Hummel's employment with Trados provided his sole source of income between 1984 and 2005; at the time of the Merger, he was earning approximately $190,000 plus an annual bonus. Hummel Dep. 132–33. SDL employed Hummel post-transaction at the same level of compensation. Tr. 667. Hummel originally was entitled to 12% of the MIP, representing $0.936 million of the Merger proceeds. Just before the Merger, Hummel complained to Campbell about some of the "strings" imposed by the MIP, such as his

one year non-competition agreement. Tr. 663. After Hummel complained, his MIP percentage increased from 12% to 14% for total proceeds of $1.092 million. *See* JX 379; JX 465. Two days later, Budge described Hummel as "obviously a lock" to vote for the Merger. JX 390.

As with Campbell, defense counsel obstructed the plaintiff's efforts to explore the materiality of the payments to Hummel, calling it "an inappropriate area of questioning." Hummel Dep. 163. Hummel only would estimate that his net worth at the time of the Merger was $2–4 million.

Taken collectively, the direct financial benefits Hummel received were material to him. He admitted that the $1 million payday was significant. *See* Hummel Dep. 164 ("A million dollars is significant, of course, yeah."). His post-transaction employment also was a material benefit. *See, e.g., In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 261 n. 45 (Del.Ch.2006) (noting that compensation from employment is generally material); *In re Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at *3 n. 3 (Del.Ch. Jan. 8, 2002) (same). The defendants' opposition to discovery warrants the same inference as with Campbell.

### b. The VC Directors: Gandhi, Scanlan, And Stone

Three of the directors—Gandhi, Scanlan, and Stone—were fiduciaries for VC funds that received disparate consideration in the Merger in the form of a liquidation preference. Each faced the dual fiduciary problem identified in *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.1983), where the Delaware Supreme Court held that there was "no dilution" of the duty of loyalty when a director "holds dual or multiple" fiduciary obligations. *Id.* If the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned,

then there is no conflict. *See, e.g., Van de Walle v. Unimation, Inc.,* 1991 WL 29303, at *11 (Del.Ch. Mar. 7, 1991). But if the interests of the beneficiaries diverge, the fiduciary faces an inherent conflict of interest.[21] "There is no 'safe harbor' for such divided loyalties in Delaware." *Weinberger,* 457 A.2d at 710. The plaintiff proved at trial that Gandhi, Scanlan, and Stone faced a conflict of interest as dual fiduciaries.

In *Trados I,* Chancellor Chandler recognized that the VC firms' ability to receive their liquidation preference could give the VC directors a divergent interest in the Merger that conflicted with the interests of the common stock. 2009 WL 2225958, at *7. In moving to dismiss, the defendants argued that because the preferred stockholders did not receive their full liquidation preference, and because the Series A and BB were participating preferred, the preferred stockholders would benefit from a higher price and their interests were aligned with the common. *Id.* Chancellor Chandler rejected their argument:

> Even accepting this proposition as true, however, it is not the case that the interests of the preferred and common stockholders were aligned with respect to the

decision of whether to pursue a sale of the [C]ompany or continue to operate the Company without pursuing a transaction at that time.

> The [M]erger triggered the $57.9 million liquidation preference of the preferred stockholders, and the preferred stockholders received approximately $52 million dollars as a result of the [M]erger. In contrast, the common stockholders received nothing as a result of the [M]erger, and lost the ability to ever receive anything of value in the future for their ownership interest in Trados. It would not stretch reason to say that this is the worst possible outcome for the common stockholders.

*Id.* The Chancellor held that it was "reasonable to infer from the factual allegations in the Complaint that the interests of the preferred and common stockholders were not aligned with respect to the decision to pursue a transaction that would trigger the liquidation preference of the preferred and result in no consideration for the common stockholders." *Id.; see also Equity–Linked,* 705 A.2d at 1058 (observing that in contrast to common stockholders, who had an incentive to maximize

---

21. *See Krasner v. Moffett,* 826 A.2d 277, 283 (Del.2003) ("[T]hree of the FSC directors ... were interested in the MEC transaction because they served on the boards ... of both MOXY and FSC."); *McMullin,* 765 A.2d at 923 ("The ARCO officers and designees on Chemical's board owed Chemical's minority shareholders 'an uncompromising duty of loyalty.' There is no dilution of that obligation in a parent subsidiary context for the individuals who acted in a dual capacity as officers or designees of ARCO and as directors of Chemical." (footnote omitted)); *Rabkin v. Philip A. Hunt Corp.,* 498 A.2d 1099, 1106 (Del.1985) (holding that parent corporation's directors on subsidiary board faced conflict of interest); *Weinberger,* 457 A.2d at 710 (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent);

*Trados I,* 2009 WL 2225958, at *8 (treating Gandhi and Stone as interested for pleading purposes when "each had an ownership or employment relationship with an entity that owned Trados preferred stock"); *see also Rales,* 634 A.2d at 933 (explaining for purposes of demand futility that " '[d]irectorial interest exists whenever divided loyalties are present' " (quoting *Pogostin,* 480 A.2d at 624)); *Goldman v. Pogo.com, Inc.,* 2002 WL 1358760, at *3 (Del.Ch. June 14, 2002) ("Because Khosla and Wu were the representatives of shareholders which, in their institutional capacities, were both alleged to have had a direct financial interest in this transaction, a reasonable doubt is raised as to Khosla and Wu's disinterestedness in having voted to approve the ... [l]oan."); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.,* 532 A.2d 1324, 1336 (Del.Ch.1987) (same).

the value of their shares, "the [preferred stockholders] inherently have some interest in protecting their liquidation preference").

Although Chancellor Chandler clearly understood the point, the fact that preferred and common "may have incentives to pursue different exit strategies is not obvious." D. Gordon Smith, *The Exit Structure of Venture Capital*, 53 UCLA L.Rev. 315, 356 (2005) [hereinafter *Exit Structure* ]. Both are equity securities which give their holders incentives to maximize value of the firm. But preferred stock carries special rights that create specific economic incentives that differ from those of common stock. VCs also operate under a business model that causes them to seek outsized returns and to liquidate (typically via a sale) even profitable ventures that fall short of their return hurdles and which otherwise would require investments of time and resources that could be devoted to more promising ventures.

### i. Economic Incentives

VCs invest through preferred stock with highly standardized features, although individual details vary.[22] VC preferred stock typically carries a preference upon liquidation, defined to include a sale of the company, that entitles the holders to receive specified value before the common stock receives anything. It usually earns a cumulative dividend which, if unpaid, steadily increases the liquidation preference. It also entitles the preferred holder to convert into common stock at a specified ratio in lieu of receiving the liquidation preference.[23] The preferred stock in this case carried each of these features.

There is nothing inherently pernicious about the standard features of VC preferred stock. The sophisticated contract rights, the use of staged financing, and the gradual acquisition of board control over the course of multiple financing rounds help VCs reduce the risk of entrepreneur opportunism and management agency costs. See Agency Costs, supra, at 983–84; *Exit Structure, supra,* at 318–24; *Venture Survival, supra,* at 56–68. Nevertheless, "[w]hile each of the ... contracting techniques helps VC investors minimize agency risk, they also give rise to the possibility

22. When investing in the United States, VCs almost exclusively use preferred stock. *See* Steven N. Kaplan & Per Stromberg, *Financial Contracting Meets the Real World: An Empirical Analysis of Venture Capital Contracts*, 70 Rev. Econ. Studs. 281, 313 (2003) (finding that 94% of VC financings between 1987 through 1999 used preferred stock); Ronald J. Gilson & David M. Schizer, *Understanding Venture Capital Structure: A Tax Explanation for Convertible Preferred Stock*, 116 Harv. L.Rev. 874, 875 (2003) [hereinafter *Tax Explanation* ] (noting that "overwhelmingly, venture capitalists make their investments through convertible preferred stock"); Joseph L. Lemon, Jr., *Don't Let Me Down (Round): Avoiding Illusory Terms in Venture Capital Financing in the Post–Internet Bubble Era*, 39 Tex. J. Bus. L. 1, 5–6 (2003) ("In the vast majority of VC financings, VCs contribute funding in exchange for preferred stock."). There is evidence that tax advantages drive the use of preferred stock for U.S. invest-

ments. *See Tax Explanation, supra,* at 877, 889. In jurisdictions with different tax rules, VCs frequently use other instruments, including common stock. *See Agency Costs, supra,* at 984.

23. A wide range of treatises, law review articles, and practitioner pieces describe the typical features of VC preferred stock. *See, e.g., Agency Costs, supra,* at 981–82 (describing features); Michael A. Woronoff & Jonathan A. Rosen, *Effective vs. Nominal Valuation in Venture Capital Investing*, 2 N.Y.U. J.L. & Bus. 199, 208–19 (2005) (same); Manuel A. Utset, *Reciprocal Fairness, Strategic Behavior & Venture Survival: A Theory of Venture Capital– Financed Firms*, 2002 Wis. L.Rev. 45, 55 & n. 16 [hereinafter *Venture Survival* ] (describing VC contracts, including preferred stock, as "highly standardized" and "mostly non-negotiable").

that the venture capitalist may use the contract rights opportunistically." Robert P. Bartlett, III, *Venture Capital, Agency Costs, and the False Dichotomy of the Corporation*, 54 UCLA L.Rev. 37, 56 n. 78 (2006) [hereinafter *False Dichotomy*]; *accord* Ronald J. Gilson, *Engineering a Venture Capital Market: Lessons from the American Experience*, 55 Stan. L.Rev. 1067, 1085 (2003) ("Reducing the agency costs of the entrepreneur's discretion by transferring it to the venture capital fund also transfers to the venture capitalist . . . the opportunity to use that discretion opportunistically against the entrepreneur.").

The cash flow rights of typical VC preferred stock cause the economic incentives of its holders to diverge from those of the common stockholders. *See Theory of Preferred, supra*, at 1832 (noting "the preferred's financial interest is defined by contract rights that conflict intrinsically with the interests of the common"). "[T]o the extent that VCs retain their preferred stock, their cash flow rights are debt-like; to the extent that they convert, their preferred stock offers the same cash flow rights as common." *Agency Costs, supra*, at 982. "Because of the preferred shareholders' liquidation preferences, they sometimes gain less from increases in firm value than they lose from decreases in firm value. This effect may cause a board dominated by preferred shareholders to choose lower-risk, lower-value investment strategies over higher-risk, higher-value investment strategies." *Id.* at 994. The different cash flow rights of preferred stockholders are particularly likely to affect the choice between (i) selling or dissolving the company and (ii) maintaining the company as an independent private business. "In particular, preferred dominated boards may favor immediate 'liquidity events' (such as dissolution or sale of the business) even if operating the firm as a stand-alone going concern would generate more value for shareholders."[24] In these situations, "[l]iquidity events promise a certain payout, much [or all] of which the preferred shareholders can capture through their liquidation preferences. Continuing to operate the firm as an independent company may expose the preferred-owning VCs to risk without sufficient opportunity for gain." *Agency Costs, supra*, at 993–94; *accord Theory of Preferred, supra*, at 1886 ("Preferred, as a senior claim, will avoid taking value-enhancing risk in a case where common, as the at-the-margin residual interest, would assume the risk.").

The distorting effects "are most likely to arise when, as is often the case, the firm is neither a complete failure nor a stunning success." *Agency Costs, supra*, at 996; *accord Theory of Preferred, supra*, at 1833, 1875. When the venture is a stunning success (everybody wins) or a complete failure (everybody loses), the outcomes are "cut and dried." William W. Bratton, *Venture Capital on the Downside: Preferred Stock and Corporate Control*, 100 Mich. L.Rev. 891, 896 (2002) [hereinafter *Downside*]. But in intermediate cases, preferred stockholders have incentives to "act opportunistically." *Agency Costs, supra*, at 993. "The costs of this value-reducing behavior are borne, in the first instance, by common shareholders." *Id.* at 995; *see Exit Structure, supra*, at 351. "[B]ecause

---

**24.** *Id.; accord* Darian M. Ibrahim, *The New Exit in Venture Capital*, 65 Vand. L.Rev. 1, 27 (2012) [hereinafter *New Exit*] (noting "traditional exits often do not align the incentives of VCs and entrepreneurs [which] can produce suboptimal outcomes for individual investors that are forced into a premature exit that leaves money on the table"); *Exit Structure, supra*, at 356 (noting "venture capitalists and entrepreneurs may have different interests regarding the timing and form of exit").

VCs in ... sales often exit as preferred shareholders with liquidation preferences that must be paid in full before common shareholders receive any payout, common shareholders may receive little (if any) payout. At the same time, the sale eliminates any 'option value' (upside potential) of the common stock." *Carrots & Sticks, supra,* at 3.[25]

### ii. Personal Incentives

The VC business model reinforces the economic incentives that the preferred stock's cash flow rights create.

> Before venture capitalists invest, they plan for exit.... The ability to control exit is crucial to the venture capitalist's business model of short-term funding of nascent business opportunities. Exit allows venture capitalists to reallocate funds and the nonfinancial contributions that accompany them .... It also allows fund investors to evaluate the quality of

their venture capitalists .... Finally, the credible threat of exit by venture capitalists may work to minimize the temptation towards self-dealing by the entrepreneurs who manage the venture-backed companies.

*Exit Structure, supra,* at 316; *see also id.* at 345 ("Any venture capitalist who desires to remain in business ... must successfully raise funds, invest them in portfolio companies, then exit the companies and return the proceeds to the fund investors, who in turn are expected to reinvest in a new fund formed by the same venture capitalist ...."). The timing and form of exit are critical because VCs seek very high rates of return, usually a ten-fold return of capital over a five year period.[26]

Three forms of exit are common. An IPO is the gold standard and most lucrative; liquidation via sale to a larger company (a trade sale) is a second-best solution;

---

**25.** Professors Brian J. Broughman and Jesse M. Fried offer a simple illustration: "Consider, for example, a startup with $50 million in aggregate liquidation preferences. Assume there is a 50% likelihood that, within one year, the firm will be worth $90 million and a 50% likelihood that it will be worth $0. A hypothetical risk-neutral buyer content to earn a 0% return would pay $45 million for all of the equity of the startup. Preferred shareholders would get $45 million; common shareholders would get $0. But if the startup were to remain independent, the common stock would have an expected value of $20 million." Brian J. Broughman & Jesse M. Fried, *Carrots & Sticks: How VCs Induce Entrepreneurial Teams to Sell Startups* 12 n. 47 (Harvard Law & Econ., Discussion Paper No. 742, 2013), *available at* http://ssrn.com/abstract=2221033 [hereinafter *Carrots & Sticks*]. The preferred stockholders will prefer their sure $45 million over the risk-adjusted $25 million. The common stockholders will prefer the opportunity to receive a risk-adjusted $20 million over a sure zero. If the preferred have the power to force a sale, then the $20 million is "the 'option value' of the common stock that is lost in the sale of the

firm today for $45 million." *Id.; see also Agency Costs, supra,* at 995–97 (providing more detailed examples). Of course, this is not the only possibility. Under other scenarios, the preferred stockholders' incentives can lead to defensible results. *See, e.g., Theory of Preferred, supra,* at 1886.

**26.** *See Venture Survival, supra,* at 60. "Among early-stage venture capitalists, ... it is generally assumed that an investment portfolio should yield an IRR of approximately 30 to 50 percent." *False Dichotomy, supra,* at 72. "[B]ecause many of these investments will ultimately be written off, VC investors commonly make individual company investments with the expectation that each will produce a 40 to 50 percent projected IRR after accounting for the venture capitalist's fees and compensation." *Id. See generally* William A. Sahlman, *A Method for Valuing High–Risk, Long–Term Investments: The "Venture Capital Method"* 7–14 (Harvard Bus. Sch., Note 9–288–006, 2003) (JX 624) [hereinafter *Venture Capital Method*] (describing factors contributing to VC demand for 50% projected IRR).

and a write-off is the least attractive.[27] "[V]enture capitalists will sometimes liquidate an otherwise viable firm, if its expected returns are not what they (or their investors) expected, or not worth pursuing further, given limited resources and the need to manage other portfolio firms."[28] This may seem irrational, but "it makes perfect economic sense when viewed from the venture capitalist's need to allocate [his] time and resources among various ventures." *Venture Survival, supra,* at 110 n. 218. "Although the individual company may be economically viable, the return on time and capital to the individual venture capitalist is less than the opportunity cost." William A. Sahlman, *The Structure and Governance of Venture–Capital Organizations,* 27 J. Fin. Econ. 473, 507 (1990). VC firms strive to avoid a so-called "sideways situation," also known as a "zombie company" or "the living dead," in which the entity is profitable and requires ongoing VC monitoring, but where the growth opportunities and prospects for exit are not high enough to generate an attractive internal rate of return. These companies "are routinely liquidated," usually via trade sales, "by venture capitalists hoping to turn to more promising ventures."[29]

### iii. The Evidence That The VC Directors Faced A Conflict In This Case

At the pleadings stage, Chancellor Chandler recognized that it was reasonably conceivable that the VC directors faced a conflict of interest. *See Trados I,* 2009 WL 2225958, at *7. At trial, the plaintiff had the burden to prove on the facts of

27. *See New Exit, supra,* at 11–13. Other alternatives include redemption by the portfolio company or a sale of the preferred stock to another investor. *See Exit Structure, supra,* at 317 n. 8. "[S]kepticism of redemption provisions is common." *Id.* at 350 n. 121. The secondary market is nascent but growing. *See New Exit, supra,* at 16–20.

28. Manuel A. Utset, *High–Powered (Mis)incentives and Venture–Capital Contracts,* 7 Ohio St. Entrep. Bus. L.J. 45, 56 (2012) (footnote omitted) [hereinafter *Venture–Capital Contracts*]; *accord False Dichotomy, supra,* at 62 ("VC funds are constrained with respect to both time and capital in their start-up company investments ...."); *Venture Survival, supra,* at 110 ("[G]iven the other firms in its investment portfolio, a venture capitalist may liquidate an otherwise viable but weaker firm because the marginal return of spending limited resources and time on that one firm may not be worth the venture capitalist's effort, despite the fact that if the venture capitalist were analyzing that firm independently, it would choose not to liquidate."); *Venture Capital Method, supra,* at 17 ("In order to realize value from their investments, the fund's managers need to commit time to board meetings, consultation with management, and other monitoring activities. Be-

cause of the number of competing opportunities ... there is a substantial opportunity cost (or shadow price) to the VC's time.").

29. D. Gordon Smith, *Venture Capital Contracting in the Information Age,* 2 J. Small & Emerging Bus. L. 133, 142 (1998); *see also Venture–Capital Contracts, supra,* at 56 (noting "venture capitalists are wary of being stuck with the 'living dead,' firms that are profitable, but not enough to allow them to be sold on a timely basis in a private sale or public offering"); John C. Ruhnka et al., *The "Living Dead" Phenomenon in Venture Capital Investments,* 7 J. Bus. Venturing 137, 147–48 (1992) (noting 20% of sample ended up as "living dead" and that "the most-often-used strategy (used in more than 75% of living dead situations) was an attempt to sell or merge the company—typically to a larger company with a related product line or technology"); Calvin H. Johnson, *Why Do Venture Capital Funds Burn Research and Development Deductions?,* 29 Va. Tax Rev. 29, 41 (2009) ("[S]emi-successful ventures are sometimes called 'zombies' or 'the living dead,' in the slang of the trade. A zombie gives back just its invested capital (or almost returns its capital), or gives back invested capital plus a return below what is needed to attract capital in a competitive market.").

this case, by a preponderance of evidence, that (i) the interests of the VC firms in receiving their liquidation preference as holders of preferred stock diverged from the interests of the common stock and (ii) the VC directors faced a conflict of interest because of their competing duties. *Cf. In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1006 (Del.Ch.2005) (commenting that the court's "job is not to police the appearances of conflict that, upon close scrutiny, do not have a causal influence on a board's process"). The plaintiff carried his burden.

Campbell testified in his first deposition, taken on September 20, 2006, just over a year after the Merger and before anyone was sued for breach of fiduciary duty, that his mission upon joining Trados "was to help the company understand its future path, which in the mind[s] of the outside board members at that time was some type of either merger or acquisition event." Campbell Dep. I 21; *see also* Tr. 117–18. Campbell perceived "degrees of aggressiveness" among the directors based on how long they had invested in Trados. Campbell Dep. I 21. From his "first week" at the Company, he perceived Gandhi as "probably the most aggressive," Scanlan next, then Stone. *Id.* at 23; *see also* Tr. 119–22. In Campbell's assessment, "[h]alf of the board felt that we should just do something now, take the first offer." Campbell Dep. II 20. Campbell saw Gandhi and Scanlan as the most influential board members. Campbell Dep. I 17, 25.

Consistent with Campbell's deposition testimony, the evidence at trial established that Gandhi faced a conflict and acted consistent with Sequoia's interest in exiting from Trados and moving on. As Gandhi explained at trial, when Sequoia invests, it hopes for "really fast" growth and "very large outsized returns." Tr. 359, 411; *see also* Tr. 412 (explaining that Sequoia's investors will not provide the firm with money "for ten or [twelve] years for [Sequoia] to get them back 10 percent returns. You can put that in a Vanguard index fund"). Within six months after the Uniscape merger, Gandhi had concluded that Trados would not deliver outsized returns and that Sequoia's "real opportunity" was only "to recover a fraction" of its $13 million investment in Uniscape. JX 96; *see also* Tr. 355–62. By the end of 2002, Gandhi had decided not to put significant time into Trados beyond Board meetings and only to attend by phone unless meetings were held locally. *See* JX 96. From his perspective, this was simply a matter of prioritizing his time based on how Trados would perform for Sequoia relative to other opportunities with "a lot of upside." Tr. 360–61. He later elaborated: "[M]y most, you know, limited resource is just where I'm putting my time. And it's just better to work on something brand-new that has a chance .... Is [the next Sequoia investment] going to be Google?" Tr. 397.

Gandhi saw a sale as a means of liquidating Sequoia's investment and moving on to better things. In June 2003, he told his partners at Sequoia that "[w]ithin 18 months the company will be a decent acquisition target ...." JX 105. Gandhi's investment outlook was a "return [of] capital at best." *Id.* At the beginning of 2004, he put McClelland in touch with Trados's then-CEO to start setting the table for a sale. In June 2004, Gandhi reported to Sequoia that "[w]e have recruited a hard-nosed CEO whose task is to grow this company profitably or sell it" and that he expected that "the company is sold within the next 18 months (perhaps sooner)." JX 172. In early 2005, he told Sequoia that Campbell's "mission is to architect an M & A exit as soon as practicable." JX 276. Contemporaneously, Gandhi told Campbell to "optimize for true liquidity" rather than

push for greater total consideration in his discussions with SDL and that "if [Trados] can get the cash component from sdl to $30m+ and get some stock," he thought "that deal is very much in the ballpark for what is reasonable" for Trados. JX 302.

The evidence at trial established that Scanlan had similar incentives, consistent with Campbell's deposition testimony. Wachovia was the earliest VC investor in Trados and bought in before the technology bubble popped. Scanlan sponsored the deal and saw himself as the "owner" of the investment. Scanlan Dep. 49; *see also* Tr. 282. In February 2001, Wachovia regarded Trados as "well positioned for an exit either through an IPO or an M & A event" and noted that Trados had "been approached by several of its competitors (Lionbridge, SDL)." JX 48 at 8. With Wachovia still invested in summer 2004, Scanlan saw a sale as the best option, even though Trados had stumbled and lacked a CEO. Despite rebuffing SDL's initial lowball offer, Scanlan testified that the Board "never let SDL go. We knew they were the only party, and we had to figure out a way." Tr. 335. Scanlan also recommended and designed the MIP to incentivize top management to favor a sale even at valuations where the common stock would receive zero.

Scanlan decided to leave Wachovia in late 2004 and informed Wachovia of his departure on January 5, 2005. When he told Campbell, in March or April 2005, Campbell asked him to stay on as Wachovia's designee until the SDL deal closed. Tr. 270–72, 337–38. Wachovia responded: "Please don't be disruptive. If you're willing to do it, even though you don't need to do it, if you're willing to do it, go ahead and stay on the board." Tr. 271–72; *accord* JX 388 (Scanlan informed Campbell that Wachovia was "sensitive" to Campbell's "concerns regarding a board change

at this juncture" and agreed to "leave [Scanlan] on the board ....". Scanlan agreed to stay on, and his willingness to continue at Trados, even after resigning from Wachovia, demonstrates his continuing loyalty to his former employer.

As Campbell testified, Stone was the least aggressive in seeking an exit. The evidence at trial nevertheless established that Stone had the same desire to exit and faced the same conflict of interest as Gandhi and Scanlan, although she was more open to considering a sale in 12–18 months rather than pushing for a near-term outcome. Stone candidly admitted that "[a]ll private equity firms, ourselves included, are always, from the moment we buy [ ] a business, looking for an exit." Stone Dep. 79. Indeed, when Hg invested in 2000, its investment thesis included an "explicit agreement with the management team" to pursue "an IPO in 18 to 24 months." *Id.*; *accord* Tr. 683 ("[T]he plan was actually to do an IPO by 2002."). In mid–2004, Hg remained invested in Trados, the Company lacked direction, and Stone felt "blind" as to Trados's options and potential. Tr. 690. She was understandably concerned: Some of Hg's "largest clients," ones that they "have the closest relationship[s] with," were direct investors in Trados, as were Hg Capital Trust (Hg's "publicly floated vehicle") and some of Stone's partners at Hg. Tr. 730–32.

Stone's view on exit is best seen in her response to the business plan that Campbell presented on February 2, 2005. After Ganesan's termination, Stone felt the Board needed to understand the Company's potential before making any decisions. Tr. 688–89. She believed the Board "would be jumping the gun" by selling before they had a plan for the business. Tr. 689–90; *see also* Tr. 752–53. But when Stone finally received Campbell's plan, she showed little interest. Within

days of the February 2 meeting, she joined the other directors in authorizing Campbell to negotiate a sale to SDL at $60 million. With the prospect of a deal that would return most or all of Hg's liquidation preference, she focused on that alternative. *See* Tr. 754 (Stone agreeing that "no one ever took Mr. Campbell's plan a step further from February 2nd"); *see also* Tr. 722–23, 750–52.

Based on this evidence and other materials on which the plaintiff relied, the plaintiff carried his burden to show that Gandhi, Scanlan, and Stone were not independent with respect to the Merger. They wanted to exit, consistent with the interests of the VC firms they represented.

### c. The Outside Directors: Laidig And Prang

Two of the directors—Laidig and Prang—were neither members of management nor dual fiduciaries. The plaintiff did not challenge Laidig's disinterestedness and independence. By contrast, the plaintiff contended that (i) Prang was not independent because of his close business relationship with Gandhi and Sequoia, and (ii) he was not disinterested because he beneficially owned preferred stock through Mentor, his investment vehicle, and received a liquidation preference for his shares.

Because of the web of interrelationships that characterizes the Silicon Valley startup community, scholars have argued that "so-called 'independent directors'" on VC-backed startup boards "are often not truly independent of the VCs." *Agency Costs, supra,* at 988. "Many of these directors are chosen by the VCs, who tend to have much larger professional networks than the entrepreneurs or other common shareholders." *Id.* If there is a "conflict of interest" between the VCs and common stockholders, the "independent directors"

have incentives to side with the VCs. *Id.* at 989.

> Many of these outside directors have— or can expect to have—long-term professional and business ties with the VCs, who are more likely to be repeat players than are most of the common shareholders. Cooperative outside directors can expect to be recommended for other board seats or even invited to join the VC fund as a "venture partner."

*Id.; accord id.* at 989 n. 63 (noting that "conversations with local VCs confirm" that "independent directors" have incentives to side with VCs); *Exit Structure, supra,* at 320 ("[I]n the event of conflict between the venture capitalist and the entrepreneur, such outside directors may have a natural inclination to side with the venture capitalist."); *Downside, supra,* at 921 (arguing outside directors are "highly susceptible to the influence of the VC"). At trial, the plaintiff could not rely on general characterizations of the VC ecosystem. The plaintiff had to prove by a preponderance of evidence that Prang was not disinterested or independent in this case. The plaintiff carried his burden.

Prang had a long history with Sequoia, dating back to Sequoia's investment in Aspect Development, where Prang was President and COO. Tr. 354, 448. After Aspect Development, Sequoia asked Prang to work with them on other companies, and Gandhi recalled "a number where we worked very collaboratively . . . ." Tr. 354. One was Uniscape. The relationship led to Prang investing about $300,000 in three Sequoia funds, including Sequoia X, which owned Trados preferred stock. At the time of the Merger, Prang was also the CEO of Conformia Software, a company backed by Sequoia where Gandhi served on the board. When Sequoia obtained the right to designate two members of Trados's Board, Sequoia designated Gandhi

and Prang. JX 79 at 14. Having considered these facts as a whole and evaluated Prang's demeanor,[30] I find that Prang's current and past relationships with Gandhi and Sequoia resulted in a sense of "owingness" that compromised his independence for purposes of determining the applicable standard of review.[31]

The plaintiff also introduced sufficient evidence at trial to establish that the $220,633 that Prang received in the Merger (through Mentor) was material to him. As with Campbell and Hummel, defense counsel limited inquiry into Prang's economic circumstances, asserting that "we don't think this is relevant and it makes the [witness] extremely uncomfortable." Prang Dep. 170. Prang would only estimate that the range of his net worth at the time of the Merger was $4–6 million dollars. His sole sources of income were whatever he made from Mentor and his annual salary of $125,000 as CEO of Conformia Software. *See* Prang Dep. 171; Tr.

909. Given this record and the litigation position taken by the defendants, the plaintiff established that $220,633 in Merger proceeds, representing nearly double Prang's annual salary and 3.7%–5.5% of his estimated net worth, was material to Prang. Prang therefore cannot be counted as disinterested for purposes of determining the applicable standard of review.

### 3. Entire Fairness

■ A reviewing court deploys the entire fairness test to determine whether the members of a conflicted board of directors complied with their fiduciary duties. "A determination that a transaction must be subjected to an entire fairness analysis is not an implication of liability." *Emerald P'rs*, 787 A.2d at 93. Conditions precedent to imposing liability include (i) a finding that the directors acted in a manner that was not entirely fair, (ii) a specification of the fiduciary duty breached (loyalty or

---

30. At trial, Prang inexplicably tried to deny that he was a Sequoia designee before eventually conceding the point. *Compare* Tr. 453 (Prang denial), *with* Tr. 801 ("[A]s far as [the stockholder agreement's] concerned, I was a Sequoia nominee. Fine, whatever that means."). He also tried to deny having any business relationships with Gandhi outside of Trados and Conformia Software, despite Gandhi's testimony about working together on a number of projects. When asked if Gandhi's position on Conformia Software's board made him one of Prang's bosses, Prang contended that as CEO and Chairman, he reported to himself. Tr. 814. Had Prang addressed these issues more candidly, I could well have reached a different conclusion.

31. *Orman*, 794 A.2d at 27 n. 55; *see, e.g., Emerald P'rs v. Berlin*, 2003 WL 21003437, at *3 (Del.Ch. Apr. 28, 2003) (holding in posttrial opinion that director who had been an employee of controller for more than ten years was not disinterested and independent in decision to evaluate controller's proposed merger), *aff'd*, 840 A.2d 641 (Del.2003); *Primedia*, 910 A.2d at 261 n. 45 (holding on a motion to dismiss that directors who had "substantial past or current relationships, both of a business and of a personal nature, with [a controller]" were not independent); *Orman*, 794 A.2d at 27 n. 55 (noting that "[a]lthough mere recitation of the fact of past business or personal relationships will not make the Court automatically question the independence of a challenged director, it may be possible to plead additional facts concerning the length, nature or extent of those previous relationships that would put in issue that director's ability to objectively consider the challenged transaction"); *In re New Valley Corp. Deriv. Litig.*, 2001 WL 50212, at *7 (Del.Ch. Jan. 11, 2001) (noting in ruling on motion to dismiss that directors were not disinterested and independent based on their "current or past business, personal, and employment relationships with each other and the entities involved"); *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, 1997 WL 208955, at *6–9 (Del.Ch. Apr. 22, 1997) (Allen, C.) (holding on a motion to dismiss that directors were not independent based on history of dealing and overlapping governance relationships).

care), and (iii) the rejection of any affirmative defenses raised by the directors, such as reliance on advisors under Section 141(e) or exculpation under Section 102(b)(7). *See id.* at 96–97.

■ "The concept of fairness has two basic aspects: fair dealing and fair price." *Weinberger,* 457 A.2d at 711. Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* Although the two aspects may be examined separately, "the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness." *Id.* But "perfection is not possible, or expected . . . ." *Id.* at 709 n. 7.

## a. Fair Dealing

The evidence pertinent to fair dealing weighed decidedly in favor of the plaintiff.

Indeed, there was no contemporaneous evidence suggesting that the directors set out to deal with the common stockholders in a procedurally fair manner. Nor were the defendants able to recharacterize their actions retrospectively to show that they somehow blundered unconsciously into procedural fairness, notwithstanding their vigorous and coordinated efforts at trial to achieve this elusive goal.

### i. Transaction Initiation

Fair dealing encompasses an evaluation of how the transaction was initiated. In this case, the VC directors pursued the Merger because Trados did not offer sufficient risk-adjusted upside to warrant either the continuing investment of their time and energy or their funds' ongoing exposure to the possibility of capital loss. An exit addressed these risks by enabling the VCs to devote personal resources to other, more promising investments and by returning their funds' invested capital plus a modest return. The VC directors did not make this decision after evaluating Trados from the perspective of the common stockholders, but rather as holders of preferred stock with contractual cash flow rights that diverged materially from those of the common stock and who sought to generate returns consistent with their VC funds' business model.[32]

**32.** From a broader market or even societal perspective, there is nothing inherently wrong with a VC exit under these circumstances. It may well be that facilitating exit results in greater aggregate returns and maximizes overall societal wealth. This court's task, at least as I understand it, is not to apply its own normative balancing of broader policy concerns, but rather to evaluate the fairness of the defendants' actions in terms of an entity-specific arrangement of contract rights and fiduciary duties. The VC contracts in this case did not attempt to incorporate any mechanism for side-stepping fiduciary duties (such as a drag-along right if the VC funds sold their shares), nor did they explicitly seek to realign the directors' fiduciary duties in a manner that might alter the traditional analysis. *See* 8 *Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, *except as may be otherwise provided in this chapter or in its certificate of incorporation. If any such provision is made in the certificate of incorporation, the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation.*" (emphasis added)). This decision provides no opportunity for expressing a view as to the

Gandhi started setting the table for a sale at the beginning of 2004 when he reached out to JMP and asked McClelland to speak with Ganesan. After the Board fired Ganesan in April 2004, the VC directors explored a near-term sale. They appointed Hummel as Acting President and sent him to float the idea with Trados's strongest strategic relationships, while simultaneously keeping him on a short operational leash that required clearing any material decisions with Gandhi and Scanlan. Gandhi put JMP to work canvassing other potential acquirers and fielded an inbound call from SDL, while Scanlan looked for a CEO who could fix up the Company and lead a sale process. The fact that the directors chose to hire Campbell rather than taking SDL's low-ball bid of $40 million in summer 2004 does not demonstrate, as the defendants claimed at trial, that they were not interested in an exit. It simply meant that the defendants recognized the likelihood of a suboptimal sale price given the temporarily distressed nature of the asset. It is difficult to get top dollar for a house with broken windows, loose trim, peeling paint, and an overgrown lawn. An owner who decides to fix up the place need not have changed her mind about what to do with the property.

In his first deposition, Campbell testified that upon joining Trados, he understood that his "mission" was to "help the company understand its future path, which in the mind[s] of the outside board members at that time was some type of either merger or acquisition event." Campbell Dep. I 21. He further understood that the "[preferred investors] who had invested longer were more aggressive to find a path for the company [i.e. the 'merger or acquisition event']." Id. Budge, the CFO, testified similarly. See Budge Dep. 117–18. It is hardly surprising that Campbell and Budge understood the mission in these terms. The Board was contemporaneously exploring a sale with JMP and authorized Scanlan to design the MIP to ensure that management would benefit from a sale even if the common did not.

To carry out his mission, Campbell recalled coming up with "three scenarios": (i) an immediate sale before the Company ran out of cash, (ii) a 12–18 month managed sale that required at least $2–4 million in additional capital, and (iii) a stand-alone business plan requiring an indeterminate amount of investment. See Campbell Dep. II 17, 34–36; JX 235 at 18, 20. In Campbell's assessment, "[h]alf of the board felt that we should just do something now, take the first offer." Campbell Dep. II 20. None of the VC directors wanted to invest in the Company to support a 12–18 month sale, much less a stand-alone business plan. Campbell was forced to raise venture debt because the "[VC] investors wouldn't kick another round [of investment] in to keep the lights on in December [2004]." Id. at 60. Actions speak louder than words, and the VC directors were telling Campbell they wanted out.

---

effectiveness of any such mechanism or realignment, and it does not intimate one. In the current case, the absence of any attempt at explicit contracting over exit-related conflicts does mean that to deviate from traditional fiduciary analysis would require giving credence to an implicit waiver or constructive fiduciary realignment. Setting aside the inherently ambiguous nature of the exercise—whether the common accepted a typical VC investment structure because they implicitly consented to a VC-dominated exit or because they believed fiduciary duties would protect them and therefore did not bargain over the issue—the structure of the DGCL and long-standing common law authority require that any such arrangement be explicit. See, e.g., 8 Del. C. §§ 102(b)(7), 141(a), 151(a), 202. See generally supra Part II.A.1.

The contemporaneous documents overwhelmingly support this account.[33] It also comports with how VCs who found themselves at or beyond their typical hold period naturally would regard a seemingly sideways if not stumbling portfolio company. Yet at trial, the defendants offered closely coordinated testimony that contradicted the contemporaneous documents and, in Campbell's case, his earlier deposition testimony. Campbell changed his story on the witness stand to claim his mission did not include a sale, but rather was "to grow the business, give it vision and create a strategy for the long-term." Tr. 11. He denied feeling that any directors were aggressive in seeking an exit. Tr. 119–22. Whereas he previously saw Gandhi and Scanlan as the two directors who were most vocal and had *de facto* lead director roles, at trial he weakly recanted and suggested that he singled out Gandhi and Scanlan simply because of geographic proximity. *Compare* Campbell Dep. I 17, 25, *with* Tr. 113–14. But Scanlan was on the East Coast, and Prang was the other director in Silicon Valley. The other defendants similarly insisted they were not interested in selling the Company during 2004 and early 2005, wanted to build the business and hired Campbell for that purpose, and were pleasantly surprised when SDL happened to come along. *See* Tr. 246, 250, 257 (Scanlan); Tr. 445 (Gandhi); Tr. 486 (Laidig); Tr. 720–21 (Stone).

The defendants' trial testimony on this point was a litigation construct. The con-temporaneous documentary evidence and Campbell's far more credible deposition testimony, backed up by Budge, establish that the VC directors wanted to exit. They were not interested in continuing to manage the Company to increase its value for the common. They initiated a sale process and pursued the Merger to take advantage of their special contractual rights.

## ii. Transaction Negotiation And Structure

Fair dealing encompasses questions of how the transaction was negotiated and structured. To analyze these aspects of the Merger requires an understanding of the MIP.

VC-backed portfolio companies commonly adopt plans similar to the MIP to incent management to favor exits. *See Carrots & Sticks, supra,* at 5. Debate has raged for decades over whether similar severance arrangements at public companies advance stockholder interests. *See, e.g.,* Henry F. Johnson, *Those "Golden Parachute" Agreements: The Taxman Cuts the Ripcord,* 10 Del. J. Corp. L. 45, 51 (1985). From a judicial perspective, the answer depends on the facts. Here, the structure and operation of the MIP provide evidence of unfair dealing towards the common stock.

Scanlan suggested a plan like the MIP in July 2004, and the Board authorized him to develop one. JX 200 at 4. In November

---

**33.** *See, e.g.,* JX 139 (Gandhi prompting JMP in early 2004 to meet with Ganesan); JX 172 (Gandhi updating his partners in June 2004 that "[w]e have recruited a hard-nosed CEO whose task is to grow this company profitably or sell it. . . . Simultaneously, [JMP] has also been retained to explore the M & A options for the business. I would expect that the company is sold within the next 18 months (perhaps sooner)"); JX 211 (Scanlan, Gandhi, and Stone speaking with SDL in summer 2004); JX 276 (Gandhi updating his partners in December 2004 that Campbell's "mission is to architect an M & A exit as soon as practicable"); JX 302 (Gandhi arguing to optimize for cash rather than pushing for a higher price); JX 310 at 000037 (Stone updating her partners in February 2005 that "[c]urrent options" were (i) sell to SDL now for approximately $60 million, (ii) sell to a private equity firm as a package deal with Bowne, or (iii) sell in 18 months).

2004, the Board "authorized a Compensation Committee, consisting of Mr. Gandhi, Mr. Scanlan and Ms. Stone, to finalize the [MIP] and schedule [of recipients] ...." JX 261 at 5. In December 2004, Campbell and Budge presented the MIP to the Board, even though they and Hummel were the three biggest recipients. The entire Board, including Campbell and Hummel, unanimously approved it. JX 277. Not surprisingly, the MIP favored the interests of the conflicted fiduciaries who initiated, designed, presented, and approved it.

The MIP paid a percentage of the total consideration achieved in any sale to senior management, before any amounts went to the preferred or the common. The percentage payout increased as the value of the deal increased as follows:

| Deal Value | MIP Percentage |
| --- | --- |
| < $30 million | 0% |
| ≥ $30 million but < $40 million | 6% |
| ≥ $40 million but < $50 million | 11% |
| ≥ $50 million but < $90 million | 13% |
| ≥ $90 million but < $120 million | 14% |
| ≥ $120 million | 15% |

JX 278. Although the MIP nominally provided for a range of deal consideration, SDL had offered $40 million for Trados in July 2004, when the Company had no CEO and was coming off a terrible first half of the year. No one has contended in this case that any suitor would have paid more than $90 million for Trados. The real issue was whether management would get 11% or 13%.

As a practical matter, at deal prices below the preferred stockholders' liquidation preference, the preferred bore the entire cost of the MIP because the common would not be entitled to any proceeds. Nothing about that is procedurally or substantively unfair. *See Jedwab*, 509 A.2d at 598 ("[S]hould a controlling shareholder for whatever reason (to avoid entanglement in litigation as plaintiff suggests is here the case or for other personal reasons) elect to sacrifice some part of the value of his stock holdings, the law will not direct him as to how that amount is to be distributed and to whom."); *see also In re Tele–Commc'ns*, 2005 WL 3642727, at *14 ("[I]f Malone wished to be fair [to the minority holders of high-vote stock], then he could have shared some part of the value of his own stock holdings."). Once the deal price exceeded the liquidation preference, however, the MIP took value away from the common.[34] At the time of the Merger, for example, the total liquidation preference was $57.9 million. The $60 million in consideration exceeded the preference, so without the MIP, the preferred stockholders would have received $57.9 million and the common stockholders

---

34. For simplicity, this decision refers to the MIP's effect on the common stock. It would be more precise to refer to its effect on the residual claimants, because the Series A and BB had the right to participate in any distribution to the common on an as-converted basis. That fact only becomes relevant in the event of a damages calculation based on diversion of merger consideration. This decision need not confront that issue, because diversion of merger consideration was not a theory that the plaintiff advanced at trial.

$2.1 million. With the MIP, management received $7.8 million, the preferred stockholders received $52.2 million, and the common stockholders received zero. To fund the MIP, the common stockholders effectively paid $2.1 million, and the preferred stockholders effectively paid $5.7 million. As a result, the common stockholders contributed 100% of their ex-MIP proceeds while the preferred stockholders only contributed 10% ($5.7 million / $57.9 million).

There is no evidence in the record that the Board ever considered how to allocate fairly any incremental dollars above the liquidation preference. Until the Merger proceeds cleared the preference, each dollar was allocated between management and the preferred stockholders, with management receiving its assigned percentage and the preferred taking the rest. But once the consideration topped the preference, thereby implicating the rights of the common, the additional dollars were not fairly allocated. All of the additional dollars went to management and the pre-

ferred. The common would not receive anything until the deal price exceeded the preference by more than the MIP payout.[35]

The break-even deal value was $66.5 million. At that point, the MIP payout would be $8.6 million, and the residual proceeds would be sufficient to pay the $57.9 million preference. Above $66.5 million, the common would receive consideration, but would still fund the MIP disproportionately. For example, at $70 million, the MIP receives $9.1 million, the preferred receive $57.9 million, and the common receive $3.0 million. Without the MIP, the preferred would receive $57.9 million, and the common would receive $12.1 million. The common effectively fund the MIP with 75% of the consideration they otherwise would receive, retaining only 25%. The preferred stockholders would not lose a dime. The following graph shows the relative contribution of the common and the preferred at different deal values:

---

**35.** This case does not present the question of what would have been a fair allocation of the cost of the MIP. The boundaries are clear: 100% could come from proceeds that otherwise would go to the preferred stock (a scenario raising no fairness issues), or 100% could come from proceeds that otherwise would go to the common stock (a scenario raising serious fairness issues). A range of intermediate allocations are possible and could be justified depending on the facts.

For purposes of fair dealing, the MIP skewed the negotiation and structure of the Merger in a manner adverse to the common stockholders. In February 2005, the Board reached a consensus that Campbell would seek $60 million from SDL. *See* Campbell Dep. I 85, 102. The defendants focused on this number after Campbell provided the waterfall analysis that Scanlan requested reflecting the allocation of deal proceeds at prices of $50, $60, and $70 million. *See* JX 299; JX 325. The price target was also influenced significantly by Invision's desire not to take a capital loss by selling below its pre-money entry price of $60 million. *See* JX 332. At that price, the preferred stockholders would receive back all of their capital and make a nominal profit. There was never any effort to explore prices above $60 million or to consider whether alternatives to the Merger might generate value for the common.

Without the MIP, in a transaction that valued Trados at $60 million, Campbell, Budge, and Hummel would have received nothing for their options, and Hummel would have received approximately $0.5 million for his common stock (excluding any participation by the Series A and BB). In confronting that reality, their personal financial interests would have been aligned with the interests of the common stockholders as a whole, giving them strong reasons to evaluate critically whether the Board should pass on the Merger and continue to operate Trados as a stand-alone entity with the prospect of a higher-valued exit in the future. Perhaps the Board would have reached the same decision, but the process would have been different.

The MIP changed matters dramatically. In a transaction at $60 million, the MIP allocated $7.8 million to senior management, with Campbell, Budge, and Hummel collectively receiving $4.2 million. Instead of $0.5 million, Hummel's share was $1.092 million. The MIP accomplished this result by reallocating to the MIP recipients 100% of the consideration that the common stockholders would receive in a transaction valued at $66.5 million or less. On top of that, the MIP's cutback feature ensured that to the extent any MIP participants might receive consideration at higher deal values in their capacity as equity holders, their MIP payout would be reduced by the amount of the consideration received. JX 278 at 3. The combination eliminated any financial incentive for senior management

to push for a price at which the common stock would receive value or to favor remaining independent with the prospect of a higher valued sale at a later date.

■ The MIP converted the management team from holders of equity interests aligned with the common stock to claimants whose return profile and incentives closely resembled those of the preferred. Campbell and Hummel in fact acted and voted in a manner that served the preferred stockholders' desire for a near-term sale. Given its design and effect, the MIP is evidence that the Board dealt unfairly with the common when negotiating and structuring the Merger.[36]

### iii. Director Approval

Fair dealing encompasses questions of how director approval was obtained. Except for Laidig, all of the directors were financially interested in the Merger or faced a conflict of interest because they owed fiduciary duties to entities whose interests diverged from those of the common stockholders. The MIP played a role here as well, because it gave Campbell and Hummel a direct and powerful incentive to vote in favor of the deal.

■ The element of Board approval also encompasses how the directors reached their decision. A director's failure to understand the nature of his duties can be evidence of unfairness. *See In re Trans World Airlines, Inc. S'holders Litig.*, 1988 WL 111271, at *5 (1988) (Allen, C.) (observing that special negotiating committee members who believed their only obligation was to determine fairness and not to maximize value for the common stock had an "imperfect appreciation of the proper scope and purpose of such a special committee"). Directors who cannot perceive a conflict or who deny its existence cannot meaningfully address it. *See Gesoff*, 902 A.2d at 1151 (treating "blithe acceptance" of representation by a conflicted attorney as "evidence of unfair dealing"); *cf. El Paso*, 41 A.3d at 440, 446 (noting defendant directors' failure to recognize and address investment bank's conflict, which was referred to as a "potential conflict" or an "appearance of conflict"). The defendants in this case did not understand that their job was to maximize the value of the corporation for the benefit of the common stockholders, and they refused to recognize the conflicts they faced.

During his deposition, Laidig volunteered that the Trados directors never considered the common stockholders:

Q: ... Was it the best thing for the common stockholders to sell the company?

Laidig: To tell you the truth, between common and preferred was only a topic which really popped up through this

---

**36.** The plaintiff did not try the case on a theory that the defendants breached their duty of loyalty by using the MIP to reallocate consideration from the common to the preferred and management, nor did the plaintiff seek damages for the class on that basis. As with other discretionary exercises of authority, the standard of fiduciary conduct requires that when approving employee compensation arrangements, directors must act to promote the value of the corporation for the ultimate benefit of the common stockholders. *See supra* Part II.A.1. Where, as here, a plaintiff has shown that the board lacked a majority of disinterested and independent directors, the standard of review is entire fairness. *See Gottlieb v. Heyden Chem. Corp.*, 91 A.2d 57, 58 (1952); *Valeant Pharm. v. Jerney*, 921 A.2d 732, 745–46 (Del.Ch.2007). It would have been difficult for the defendants to prove that the MIP was fair. A logical remedy would have been for the class to recover its share of the consideration that would have dropped to the residual claimants had the MIP been structured fairly. The plaintiff, however, did not pursue this angle, likely because the resulting damage award would have been relatively small.

court case. I didn't even remember this thing as being a debate or discussion on the board . . . .

Q: You don't recall any discussion at the board level as between the interests of the common stockholders[?]

Laidig: No. . . . It only once came up, you know, in conjunction with the stock option plan, you know, when we reduced the value. That's what I have a vague memory of.

Laidig Dep. 44–45; *see also* Tr. 498 ("I said very clearly, '[w]e did not discuss common versus preferred.'"). Laidig's deposition testimony comports with the documentary record, which does not reflect any serious consideration of the common stock or the divergence of interests between the common and the preferred.

At trial, the defendants tried to sanitize Laidig's admission with a two-pronged response. First, Laidig changed his story, testifying that although his deposition testimony was accurate "at that point in time," he subsequently refreshed his recollection by reviewing documents. Tr. 480, 494; *accord* Tr. 498–99 ("Basically, you know, I went through all of the documentation which was hundreds of pages from the various board meetings and, you know, prepared myself for the court case knowing that you will always get to this point."); *see also* Tr. 490, 496. This review ostensibly enabled him to recall that the Board did discuss the distinction between the common and preferred stockholders and considered the interests of the common. Tr. 498–500.

Of the "hundreds of pages" Laidig said he reviewed, he could recall only two documents that refreshed his recollection on this point: the minutes of the February 2, 2005 Board meeting and Scanlan's waterfall analysis. Tr. 496–97, 499–501. The minutes do not reflect any discussion of the relative interests of the preferred and the common, much less a discussion of the Merger or alternatives to the Merger from the perspective of the common stock. When presented with the minutes on cross-examination, Laidig conceded this unavoidable fact and changed his story again to say that he recalled the discussion "based on my personal notes, which I take at board meetings . . . ." Tr. 502–03. No personal notes had been produced in discovery. In response to further cross-examination, Laidig admitted that he no longer had his notes, and that he had not had them at the time of his deposition either. *See* Tr. 503. Like the minutes, the waterfall analysis merely depicts that the common stock receives nothing in deals valued at $60 million or lower. *See* JX 325. It does not reflect or suggest any analysis of the Merger or other alternatives from the perspective of the common stock. Laidig's performance at trial convinced me that his deposition testimony was candid and truthful.

Second, the other directors tried to fix Laidig's admission by reciting in lockstep that they considered all of the Company's *stakeholders*, which necessarily included the common *stockholders*.[37] The chorus

37. *See* Tr. 317 (Scanlan explaining "I viewed the operation as a whole in its best interests and all of its stakeholders and all of its shareholders as my duties."); Tr. 386, 417–18 (Gandhi stating his duty was to "maximize the value of the enterprise" for the benefit of "all the stakeholders"); Tr. 648–50 (Hummel stating that "there were a lot of stakeholders" and that he viewed his duties as ensuring that

"customers would continue to have access to [Trados] technology," that "people continue in jobs or, if they change jobs, that they would have success on their resume," that "morally and ethically, for me it was important that the money I've raised . . . that we pay that money back," and that "[t]he Trados brand is still out there"); Tr. 734–38 (Stone testifying that she represented "all stakeholders" and her

sounded well-rehearsed, but the individual verses mentioned justifications that happened to coincide with the directors' personal interests. Hummel, for example, said he favored the transaction in part because it would preserve Trados's technology, which he had developed and worked on for years. By having the Trados brand "still out there," he could "have it on [his] CV and so can the other founders." Tr. 649–52. Stone considered Hg's "reputation" and the benefits that would inure to Hg from "seeing people remain employed." Tr. 722. Gandhi thought about his duties to Sequoia's partners and its clients. *See* Tr. 417. The directors' stakeholder testimony reflected Chancellor Allen's timeless insight that "human nature may incline *even one acting in subjective good faith* to rationalize as right that which is merely personally beneficial." *City Capital Assocs. Ltd. P'ship v. Interco Inc.*, 551 A.2d 787, 796 (Del.Ch.1988).

The Board's *ex post* embrace of stakeholders did not in actuality encompass any consideration of the common stockholders. When pressed, the directors could not recall any specific discussion of the common stock, and they could not comprehend the possibility that the economic interests of the preferred stockholders might diverge from those of the common. *See* Tr. 291–92, 317–18 (Scanlan); Tr. 419 (Gandhi); Tr. 738 (Stone); Tr. 900 (Prang). Gandhi was particularly strident:

[P]eople ultimately wonder about this, the preferred versus common and the conflict. There's no conflict. When ... a venture capital firm makes money, they only make money in scenarios where they're ... converting to common shares. I think like a common shareholder because the great investments mean the common did phenomenally well and, therefore, I did well. We never made money on preferred instruments. Preferred for us, ... [is] a thinly veiled version of common. It gives you a couple little rights: you're a minority investor. You can't tell anybody what to do, there's no control. You get to be on the board as one board member; and you have to use persuasion, influence, and good reasoning and arguments more than anything else. There's no control provision at all. Maybe there's some negative control provisions, like they have to ask you if they sell the company or something like that.

Tr. 390–91; *accord* Tr. 417 ("I understand people talk about conflicts and things like that. Over a long period of time over a lot of companies, there's much more consistency there than there's conflict.").

Conflict blindness and its lesser cousin, conflict denial, have long afflicted the financially sophisticated.[38] Given the directors' intelligence, educational background, and experience, I believe they fully appreciated the diverging interests of the VCs, senior management, and the

interest was to "maximize the value of the entity"); Tr. 788, 900 (Prang sought to "maximize the value of the corporation" for the benefit of "the company and all stakeholders").

**38.** *See, e.g.,* Thurman W. Arnold, *The Folklore of Capitalism* 293–95 (1937) (Charles Hayden testifying that no conflict arose from his simultaneous roles as (i) chairman of the board of Cuban Cane Sugar Corp. ("Cuban Cane"), (ii) head of Hayden & Stone, the investment

bank which sold Cuban Cane's defaulted bonds, and (iii) director of Chase National Bank and New York Trust Company, both creditors of Cuban Cane, which insisted on security for their loans at Hayden's recommendation shortly before Cuban Cane defaulted on its bonds (quoting SEC Report On The Study And Investigation Of The Work, Activities, Personnel And Functions of Protective Committees 457–62 (May 10, 1937))).

common stockholders. Despite this reality, the defendants did not consider forming a special committee to represent the interests of the common stockholders.[39] *See* Tr. 289 (Scanlan); Tr. 485–86 (Laidig); Tr. 658 (Hummel); Tr. 904 (Prang). They also chose not to obtain a fairness opinion to analyze the Merger or evaluate other possibilities from the perspective of the common stockholders. *See* Tr. 218 (Campbell); Tr. 277–78 (Scanlan); Tr. 388–89 (Gandhi); Tr. 500 (Laidig); Tr. 658–59 (Hummel); Tr. 904 (Prang); Tr. 962 (McClelland). At trial, the defendants uniformly cited the cost of a fairness opinion, mentioning figures typical of bulge bracket institutions and their aspiring competitors. But no one appears to have explored the possibility contemporaneously, even after SDL's counsel expressed "concerns over [the] common stockholders ... not getting any consideration," JX 392 at 40092, and questioned whether Trados needed a "JMP fairness opinion ...." JX 457 at 47624. One can remain appropriately skeptical of the value of fairness opinions while at the same time recognizing that an outside analysis of the alternatives available to Trados would have improved the record on fair dealing. Taken as a whole, the manner in which director approval was obtained provides evidence of unfair dealing.

### iv. Stockholder Approval

Finally, fair dealing encompasses questions of how stockholder approval was obtained. The defendants never considered conditioning the Merger on the vote of a majority of disinterested common stockholders. *See, e.g.*, Tr. 508–09 (Laidig).

The vote on the Merger was delivered by the preferred, who controlled a majority of the Company's voting power on an as-converted basis, and other "[l]arge [f]riendlies," such as Hummel. *See* JX 419. Hummel originally was entitled to 12% of the MIP, but when he seemed to be having second thoughts just before the Merger, his MIP percentage was increased from 12% to 14%. *See* JX 379. Two days later, Budge described Hummel as "obviously a lock" to vote in favor of the Merger. JX 390. Other common stockholders reached different conclusions. One of the largest common stockholders, Microsoft, abstained because it could not stomach "the economic result" of the Merger, *i.e.* the fact that it would receive nothing. JX 513. The plaintiff, who owned 5% of the common stock, sought appraisal.

"Stockholders in Delaware corporations have a right to control and vote their shares in their own interest." *Bershad v. Curtiss–Wright Corp.*, 535 A.2d 840, 845 (Del.1987). "They are limited only by any fiduciary duty owed to other stockholders. It is not objectionable that their motives may be for personal profit, or determined by whim or caprice, so long as they violate no duty owed [to] other shareholders." *Id.* The fact that the preferred stockholders voted in their own interest is therefore not evidence of unfair dealing. The failure to condition the deal on a vote of the disinterested common stockholders is likewise not evidence of unfairness; it simply deprives the defendants of otherwise helpful affirmative evidence of fairness. The effect of the MIP on Hummel's voting preferences, however, provides some additional evidence of unfairness.

---

**39.** The decision not to form a special committee had significant implications for this litigation. The Merger was not a transaction where a controller stood on both sides, and the plaintiff did not challenge Laidig's independence or disinterestedness. If a duly empowered and properly advised committee had approved the Merger, it could well have resulted in business judgment deference. Admittedly, under those circumstances, the plaintiff likely would have found reason to criticize Laidig.

### b. Evidence Pertinent To Fair Price

In contrast to the evidence on fair dealing, which decidedly favored the plaintiff, the evidence on fair price was mixed. Consistent with the amount of consideration that the common stockholders received in the Merger, the defendants strived at trial to demonstrate that the common stock had no value. As with their trial testimony on issues relevant to fair dealing, the defendants adopted aggressive positions that were contrary to the contemporaneous documents and their earlier testimony. But as will be seen in the unitary fairness determination, their evidence on price fairness was ultimately persuasive.

### i. Trados's Dire Situation

To prove that the common stock had no value, the defendants tried to depict Trados as a failing entity without cash, a business plan, or an addressable market. Each contention had a kernel of truth, but the directors exaggerated to the point of caricature.

One of the directors' themes was that without a sale to SDL, Trados could not self-fund its business plan, would have run out of cash within 90 to 120 days, and then would have entered bankruptcy.[40] At one point during their efforts to sell the Company, bankruptcy was a real risk, but that was in summer 2004 when Trados faced a cash crunch after its losses during the second quarter. If Trados had suffered a third quarter similar to the second, it would have run out of cash. Campbell, however, recognized the problem and moved to address it. He obtained venture debt financing, thereby solving the near-term issue. He also took steps to right size the Company, improve its cash conversion cycle, and reduce its working capital. He succeeded, as shown by the decision to defer drawing the second tranche of the Western Tech facility. Thanks to Campbell's managerial acumen, the Company's cash position improved substantially and during the first half of 2005 stayed above $5 million and ahead of budget.

Campbell also improved the Company's operations. Before he entered the picture, Trados budgeted a third quarter loss of $1.4 million. Arriving with only one month left in the quarter, Campbell cut the actual loss to $0.9 million, then turned in a fourth quarter that achieved a "record profit" of $1.1 million. JX 231; JX 318 at 4. Stone reported to Hg that Trados finished "the year well—ahead of forecast," Campbell was "performing well," product development was "on track," and the pipeline looked "fine." JX 310 at 000033. Trados's performance during the first half of 2005 showed that Campbell had stabilized the Company. During the first quarter, Trados made its revenue budget and was profitable. During the second quarter, Trados continued to exceed budget for revenue and operating income. See JX 372; JX 394. In May 2005, Stone reported to Hg that "[f]or the first time, the business is ahead of budget in all key areas and has a seemingly good pipeline. Q1 was a record quarter and the business has made a profit." JX 393 at 000051. Although Trados nominally missed its revenue budget in June by $1.8 million, JX 447, this was only because Trados management intentionally delayed product shipments so that SDL

---

40. *See* Tr. 16 (Campbell testifying Trados could "run out of cash within the next 90 to 120 days"); Tr. 249 (Scanlan testifying Trados was "bleeding" and "didn't have a runway"); Tr. 390 (Gandhi testifying Trados would have gone "bankrupt"); Tr. 649 (Hummel testifying Trados's "outcome was highly likely . . . bankrupt[cy]"); Tr. 722 (Stone testifying Trados was in a "death loop"); Tr. 779, 791 (Prang testifying Trados would "be out of business").

could book the revenue after the Merger closed. But for the revenue manipulation, Trados would have met or exceeded its revenue budget in each month of 2005. Contrary to the defendants' exaggerated trial testimony, the Company was not headed for a cliff, and there was a realistic possibility that it could self-fund its business plan.

Along similar lines, the directors attempted at trial to disavow the business plan itself, and they were particularly critical of GIS. Campbell claimed at trial that he "invented" GIS, that Trados had no products to support it, and that developing a product from scratch would have required $15 million of additional investment. Tr. 62. Scanlan denigrated GIS as Campbell's attempt to "make up an idea for a new business plan . . . ." Tr. 300. Prang called it "nothing," just a "couple of slides." Tr. 784. Gandhi went the farthest, describing it as "fantasyland." Tr. 378; accord Tr. 420 ("There's no GIS. GIS is a fantasy."); Tr. 423 (GIS was a "phantom" and "made up . . . ."); Tr. 424 (GIS was a "whisper" or "glimmer" of "some kind of idea."). He even claimed that for SDL to have paid anything for the Company based on GIS was "unfair to the buyer." Tr. 389.

The directors' trial testimony contrasted sharply with their depositions, when they could not remember whether Campbell even presented a business plan or if the Board discussed it. See Scanlan Dep. 129–30; Gandhi Dep. II 92–93; Stone Dep. 118–19; Prang Dep. 116. Campbell's efforts to downplay his GIS plan conflicted with other testimony, where he admitted that he and others at Trados put "a lot of hard work" and "a lot of good work" in the plan. Tr. 62, 95–97. Campbell also believed that Trados was executing on the GIS vision. Tr. 176–77.

Hummel saw value in the business plan. As he credibly explained, GIS was Campbell's shorthand for the enterprise content management space where he thought Trados could command the highest multiple for its business. This involved completing a transition from traditional desktop vendor to enterprise software provider with the added concept of content management. Before Campbell arrived, Trados was widely perceived as a services business for individual translators, but that business had become commoditized, was not covered by any analysts, and appeared vulnerable to continuing technological erosion. GIS was an "attempt to somehow . . . communicate to the market the importance of multilingual content" and to present Trados as offering a content management solution. Tr. 558. By continuing the shift to enterprise products and emphasizing that aspect of the business, Campbell believed the Company could grow and command a higher multiple.

Contemporaneous documents show that Campbell was making progress in repositioning the Company. During the first half of 2005, Trados issued press releases and produced case studies to rebrand itself in the GIS space, and three market analysts issued reports on Trados. See, e.g., JX 625; see also JX 540 at 1 (discussing post-Merger . marketing "initiatives"). Trados had enterprise products, and a May 2005 internal management presentation discussed delivering "GIS prototype functionality" as one of Trados's "Q2 Product Development Objectives." JX 416 at 1. The project was "on plan." Id.

SDL saw value in the business plan and GIS. Campbell testified that SDL insisted on a non-compete because SDL feared that Campbell would take his business plan, get funding, and "be directly competitive in a very bad way to SDL." Tr. 99–100; accord Tr. 192 ("SDL liked the vision. They liked

the vision a lot. They felt they needed me ... on the [SDL] board to help roll [GIS] out."). Post-closing documents establish that SDL embraced and pursued GIS, albeit with one word substitution: SDL called it Global Information *Management,* or "GIM." *See* JX 530 (SDL marketing materials discussing GIM); JX 540 (same); JX 548 at 7 (SDL's 2005 annual report emphasizing GIM); JX 531 at 2 (analyst report stating that "Global Information Management Spells a Much Bigger Market" for SDL). The February 2005 plan was not a sure thing, and GIS was the riskiest part, but it was viable.

The directors' third theme was that Trados could not grow because it operated in a stagnant niche market. Campbell estimated that Trados's addressable market, given its existing resources, was $65 million. JX 309 at 35747. Prang believed the market was "much less than that," around $50–55 million. Tr. 467. Gandhi again was the most extreme, calling it a "non-market." Tr. 371–75; *see also* Tr. 386 ("I think that [Trados's] existing market was going to have a higher likelihood of declining versus growing."); Tr. 411 ("[T]he desktop market was limited and probably declining ...."); Tr. 380 ("I don't care if you're talking about 5 or 10 percent growth. That's flat in Silicon Valley .... [T]hat's a 1 times revenue [valuation], if you can get it.").

Here too, the documents told a different and less one-sided story. IDC, a market research firm, thought the market was more substantial. *See* JX 100 (IDC "expects the worldwide revenue for translation/globalization software tools to be $147 million in 2002 .... The market is now forecast to increase to $247 million in 2007, an 11% [CAGR] ...."); JX 156 (IDC "expects the worldwide revenue for translation/globalization software to be $158 million in 2003 .... The market is

now forecast to increase to $238 million in 2008, an 8.6% [CAGR] ...."). In business presentations, Trados estimated that the market was more significant than the directors claimed at trial. *See* JX 169 at 3 (Trados presentation to Microsoft describing market potential of $250 million from translation departments and service providers); JX 220 at 9 (Trados presentation to Documentum incorporating IDC forecast of worldwide translation/globalization software revenue). Stone and SDL both perceived the market to be bigger. *See* JX 310 at 000037 (Stone noting in an update to her partners that Trados's market was $100 million and growing at 5%); JX 511 at 11 (SDL calculating market size as $175 million, consisting of machine translation, translation memory, and other services, and growing to $263 million by 2009). Even Campbell's assessment of a $65 million addressable market was not as bleak as the directors claimed at trial: the bulk of Trados's addressable market—$45 million—was in enterprise software, where Trados only held 26% of the market and therefore had some room for growth. *See* JX 309 at 35749. The broader language services market was orders of magnitude bigger. *See* JX 531 at 2 (analyst commenting on the Merger and noting that "language services rings up over US$8 billion in outsourcing per year"); JX 48 at 3, 13–14 (Wachovia estimating translation market in 2001 at $11.5 billion).

The threat of bankruptcy, the viability of the business plan, and the size of Trados's market were all concerns, but the directors' portrayal at trial was overly strident. In evaluating fairness, I have taken these issues into account, but as risks rather than mortal crises.

### ii. Fair Market Value Determinations For Option Grants

To prove the contrary proposition that the common stock had value, the plaintiff

cited minutes in which the directors determined that the fair market value of Trados's common stock was $0.10 per share. Federal law mandates that if an issuer wants to avoid generating immediate income for an option recipient, then the exercise price for the option must be equal to or greater than the "fair market value of the stock at the time such option is granted . . . ." 26 U.S.C. § 422(b)(4). IRS regulations require that a non-public company determine fair market value by taking into account "the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors." 26 C.F.R. § 20.2031–2. Serious penalties attach when taxpayers make false statements to the IRS.[41]

The Board first determined that the fair market value of Trados's common stock was $0.10 per share in July 2004, during the Board's initial effort to explore a sale. In making this determination, the directors lowered the fair market value from their previous valuation of $0.25 per share. JX 200 at 3. In November 2004, the Board reiterated its $0.10 per share determination. JX 261 at 3. In February 2005, contemporaneously with their decision to authorize Campbell to negotiate a sale to SDL at $60 million, the directors again resolved unanimously

[t]hat the Board hereby determines in good faith, after consideration of such factors as it deems necessary and relevant, including, but not limited to, current financial condition, business outlook, status of product development efforts, and business risks and opportunities relevant to the Company, that the fair market value of the Common Stock of the Company is $0.10 per share as of the date hereof [and] . . .

[t]hat the Board hereby determines that the exercise price of the Options granted pursuant to these minutes of the Board shall be $0.10 per share, which is equal to the current fair market value of the Common Stock of the Company as determined in good faith by the Board.

JX 319 at 00017. Most pertinently, on April 21, 2005, after the Board had approved the LOI and Campbell had executed it, the directors approved identical resolutions. JX 381 at 01517; *see also* Tr. 178–82.

At trial, the directors foreswore their earlier determinations, testifying that despite the recitations in the minutes that they determined "in good faith" that the fair market value of the common stock was $0.10 per share, they actually did not believe at the time that it was true.[42] Their

---

41. *See* 26 U.S.C. § 6662 (civil penalty for accuracy-related tax underpayment); *id.* § 6663 (civil penalty for fraudulent tax underpayment); *id.* § 6701 (civil penalty for aiding and abetting understatement of tax liability); *id.* § 7201 (criminal penalty for willfully attempting to evade or defeat tax). In this case, I suspect any mispricing would not result in an underpayment. By setting the fair market value of the common stock above what the defendants now say was its actual value of zero, then setting the option strike price at the purported fair market value, the Board granted an out-of-the-money option that was underwater by $0.10 at the time of grant.

42. *See* Tr. 396 (Gandhi describing the option price as "arbitrary" and based on "rough rules of thumb about option value pricing"); Tr. 575–76 (Hummel testifying that "the correct strike price [for the options] should have been zero" but that the Board set a price that was "not too far away from the real value at that time which was zero"); Tr. 712–13 (Stone testifying that she believed the "common stock of the company" was "worth nothing" on April 21, 2005). Prang first testified that he actually believed that the fair market value of the common stock was $0.10 per share on February 2, 2005. Tr. 869–70. He later recanted and joined the other directors by contending that they "believed [they] couldn't set it at zero," so they chose $0.10

reasons for misstating the fair market value of the stock were hardly laudable and amounted to benefitting the Company by misleading its employees and the IRS. According to the directors, they needed to ascribe positive value to the common stock so current and prospective employees would think the options were worth something.[43] They also thought that if the fair market value was set at zero or close to it, the IRS might get suspicious. *See, e.g.,* Tr. 575, 641 (Hummel); Tr. 899 (Prang).

Although it is difficult to countenance a "believe-me-now-that-I-was-lying-then" defense and tempting to hold the defendants to their determinations of fair market value, the directors convinced me that the minutes were, in fact, false. VC portfolio company boards often use rough, even arbitrary rules of thumb when determining the fair market value of stock for purposes of option grants.[44] It is also impossible to overlook the fact that the fair market value determinations were made during an era when stock option backdating was prevalent among Silicon Valley technology companies.[45] In an environment of laxity and sloppiness (at a minimum) regarding option grant dates, it is unsurprising for a non-public company during the same period to have taken a less than rigorous approach to option-related valuation. I do not rely on the minutes in evaluating fair price.

per share for "accounting reasons and tax reasons and something else." Tr. 899.

43. *See* Tr. 181 (Campbell justifying option price because otherwise Trados "couldn't bring new people into the company" and he "would have been in serious trouble"); Tr. 396 (Gandhi explaining "we had to do something .... [We were] having a hard time keeping people and recruiting people. They have other options in Silicon Valley, and we just have to feel like the equity is ... going to be worth something"); Tr. 497 (Prang agreeing that the Board set the price to "make it more attractive to the employees"); Tr. 899 (Prang testifying "we believed we couldn't set it at zero. It was [for] accounting reasons and tax reasons and something else. And we had to have, we believed, a value on [the] stock because, if the LOI fell through, we had to continue as an entity and we needed a price to issue new share grants"); Tr. 575 (Hummel stating that a zero stock price "would trigger some suspicion with a [prospective] tech guy" and make a poor recruiting pitch); Tr. 713 (Stone explaining that the "business as normal would ... continue granting options to people, as part of the culture of the business, but also generally part of the incentives of the business. That's why we're doing options. Why [$0.]10 rather than another value? We had already taken the value down from [$0.]25 to [$0.]10. It's not an exact science").

44. *See New Exit, supra,* at 18 ("[W]hen granting stock options to employees, start-ups usu-

ally take the position that the stripped-down common stock is worth no more than ten percent of the latest preferred price ...."); Jeff Thomas, *The Legal Spark,* 78 UMKC L.Rev. 455, 472 n. 18 (2009) ("In the past, many startups used a 10:1 valuation ratio for preferred stock and common stock issued at the same time."); *Tax Explanation, supra,* at 900 n. 86 (citing a rule of thumb that the fair market value of common stock should be set at one-tenth of the latest preferred stock price and reporting that some VCs valued the common stock more aggressively at one-thousandth of the latest preferred stock price).

45. A prominent study published in early 2005 identified statistically abnormal patterns associated with the dates of stock option grants. *See* Erik Lie, *On the Timing of CEO Stock Option Awards,* 51 Mgmt. Sci. 802 (2005). In March 2006, a *Wall Street Journal* article brought public attention to SEC investigations into option backdating and identified companies where option grant dates seemed uncommonly advantageous. Charles Forelle & James Bandler, *The Perfect Payday,* Wall St. J. (Mar. 18, 2006), *available at* http://www.stat.yale.edu/~jay/News/WSJmain.pdf; *see also* Lara E. Muller, *Stock Option Backdating: Is the Government's Response Enough to Eliminate the Problem or Is It Still a Work in Progress?,* 51 Santa Clara L.Rev. 331, 335 (2011) (discussing scope of the problem).

### iii. The JMP Valuation

To prove that Trados's value exceeded the deal price and that a stand-alone alternative would have generated something for the common, the plaintiff relied on the valuation of Trados that JMP prepared for the Board meeting on July 7, 2004. *See* JX 198. JMP used a comparable company method that yielded an indicative value for Trados of $55 million. Because it was based on a trading multiple, that number arguably included some discount for minority status.[46] JMP also used a comparable transaction method that implied an enterprise value for Trados of approximately $75 million. Because it was based on an acquisition multiple, however, that figure implicitly included some value for synergies. *See Montgomery Cellular Hldg. Co., Inc. v. Dobler*, 880 A.2d 206, 222 (Del.2005); *Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.*, 847 A.2d 340, 356 (Del.Ch.2004). To the extent Trados's stand-alone value in July 2004 was somewhere between $55 million and $75 million, then the JMP valuation presented a problem for the defendants because Trados's financial performance improved significantly after Campbell arrived. Moreover, in contrast to the 2.8 multiple implied by JMP's comparable transaction analysis, the Merger valued Trados at 2.3 times revenue based on Trados's 2004 year-end financials. *See* JX 279 (noting revenue of $25.9 million for 2004). The multiple would be even lower based on Trados's performance during the first half of 2005.

The defendants' response at trial was more strained testimony: McClelland claimed the July 2004 analysis was not a

valuation at all. Tr. 933. Instead, he described JMP's work as simply an "application of these comparables to Trados'[s] figures." Tr. 973. This was sad. JMP's analyses were titled "Valuation Considerations" and "Valuation Summary." JX 198 at 12–15. In his deposition, McClelland described the same pages candidly as "suggest[ing] [a] range of value." McClelland Dep. 64; *accord id.* ("Page 13 does contain a range of valuation."). The presentation was, on its face, a standard investment banker valuation that included the ubiquitous "football field" valuation summary. *See* JX 198 at 13.

Although I reject McClelland's timorous relabeling of JMP's work, the July 2004 presentation was not a valuation for the ages. The comparable companies and transactions that JMP selected were a broad admixture that implied an expansive range of value running from $20.4 million to $169.8 million. With the high end coming in more than eight times the low, the resulting dispersion was four times what Chancellor Allen famously described as a range that "a Texan might feel at home on." *Paramount Commc'ns*, 1989 WL 79880, at *13 (describing a range of $208–402 per share). A spread of that magnitude might be fine for a first cut, but it needed refining. Moreover, although the presentation implied a value of $55–75 million, it was clear from contemporaneous efforts to explore a sale that no one was interested in acquiring Trados at those prices. But for SDL, no one seemed interested in Trados at all. The real-world data called for a sharper pencil.

---

46. *See M.G. Bancorp., Inc. v. Le Beau*, 737 A.2d 513, 523 (Del.1999) (approving adjustment to comparable company valuation to correct for implicit minority discount); *Agranoff v. Miller*, 791 A.2d 880, 900 (Del.Ch. 2001) (correcting for implicit minority discount). I say "arguably" because scholars have raised fair questions about the origins and rationale underlying the implicit minority discount. *See generally* Lawrence A. Hamermesh & Michael L. Wachter, *The Short and Puzzling Life of the "Implicit Minority Discount" in Delaware Appraisal Law*, 156 U. Pa. L.Rev. 1 (2007).

After July 2004, JMP never made another presentation to the Board. It is therefore impossible to know how JMP would have revised its analysis to evaluate the Merger or opine on fairness. Instead, in January 2005, Campbell asked JMP to generate a better set of comparables. On January 31, JMP provided a "larger number of general M & A software deals" that yielded a median transaction multiple of 2.2 times LTM revenue. JX 307. JMP also broke out its comparable companies into a "content" set and a "language translation services" set (consisting of only Lionbridge and SDL). *Id.* The former had a median trading multiple of 1.6 times LTM revenue; the latter had a median trading multiple of 1.5 times LTM revenue. McClelland then asked Campbell if he "would like to see any of this [data] cut in another way." *Id.*

Campbell took up McClelland on his offer. On February 1, 2005, JMP provided another cut of the trading multiples. At Campbell's request, JMP had removed Adobe, Macromedia, and Viewpoint from the content set and added Bowne to the services set, reducing the trading multiples of both sets. *Compare* JX 311 at 00735, *with* JX 307 at 00732. On February 17, McClelland sent Campbell "some M & A [transaction] comps that work[ ] out to a median just under 2x [revenue]." JX 336. To get there, McClelland pared down the larger data set he produced on January 31 and added three transactions from 2002. *Compare* JX 336 at 00750, *with* JX 307 at 00731. Campbell then asked whether "there [had] been any activity we could represent from the globalization players," which in Campbell's view meant Bowne, Lionbridge, and SDL. JX 341. McClelland generated a separate list of acquisitions by those companies, which had a median transaction multiple of 1.3 times revenue. JX 343.

Campbell provided the resulting multiples to the Board. In testifying about their support for the Merger, the directors consistently recalled multiples of approximately 1.0 times revenue and stated that those multiples gave them comfort in the greater than 2.0 times revenue multiple implied by the Merger. *See* Tr. 45, 76, 211 (Campbell); Tr. 380–81, 383, 387, 429 (Gandhi); Tr. 574 (Hummel); Tr. 678, 710–11 (Stone); Tr. 878–79 (Prang). The plaintiff sees dark motives behind Campbell's actions and believes he tried to manipulate the valuation information to justify the SDL deal.

I do not share this view. Despite McClelland and Campbell's problematic testimony on other issues and the winding path by which the revised multiples reached the Board, the evidence as a whole convinces me that Trados did not have any true peer companies. The best available comparables were the language translation services companies—Lionbridge, SDL, and Bowne—which traded, respectively, at 1.6, 1.3, and 0.6 times LTM revenue. *See* JX 316. Before Trados could capture a higher multiple, it needed to execute on Campbell's business plan and complete the transition to a primarily enterprise-driven business. Even then, it would be up to the market to determine whether the resulting business warranted a higher valuation. I therefore do not believe that JMP's July 2004 valuation was inherently credible or that Campbell nefariously manipulated the comparables to generate artificially low multiples.

### iv. The Expert Valuations

Both sides introduced expert testimony on the issue of fair price. Gregg A. Jarrell, the defendant's expert, provided a balanced valuation that addressed the central issue in this case: whether Trados could generate positive value for the common stock if operated on a stand-alone basis

according to the February 2005 business plan. William Becklean, the plaintiff's expert, did not provide similarly persuasive testimony.

Jarrell prepared comparable company and comparable transaction analyses but concluded that the comparables were insufficiently close to Trados to generate a reliable valuation. He therefore relied exclusively on a discounted cash flow ("DCF") analysis based on the February 2005 business plan. For his projections, Jarrell started with the February 2005 projections, which were bullish, then added a second stage of more moderate growth. Management's projections assumed that (i) revenue would grow at a compound annual growth rate of 24% from 2004–2007 (versus a historical compound annual growth rate of 18% from 2001–2004) and (ii) EBITDA margins would average 15.4% from 2005–2007 (versus negative historical EBITDA margins in 2001, 2002, and 2004 and a positive historical EBITDA margin of 2% in 2003). For his second stage, Jarrell started with management's projected revenue growth rate of 31.6% in 2007, then lowered the growth rate evenly across each year of the five year secondary period to reach a perpetuity growth rate of 7%. This calculation effectively assumed that between 2004 and 2012, Trados's revenue would grow annually at a rate of 21%. For his second stage EBITDA margins,

Jarrell began with management's projected margin of 19.4% in 2007, then lowered the margin evenly across each year to ultimately reach 15% in 2013. Based upon these assumptions, Jarrell projected net cash flow for Trados of negative $483,000 in 2005 rising to $9.3 million in 2013.

In steady state, it is typically assumed that future business growth will approximate that of the overall economy. *See e.g., Global GT LP v. Golden Telecom, Inc.,* 993 A.2d 497, 513 (Del.Ch.2010) (noting that nominal GDP growth can be an appropriate proxy for a perpetual growth rate), *aff'd, Golden Telecom, Inc. v. Global GT LP,* 11 A.3d 214 (Del.2010). Jarrell used a perpetuity growth rate of 7% because it is the long-term growth rate of the U.S. economy since the end of World War II. This was generous to the plaintiff; Delaware decisions often use lower growth rates.[47]

For his discount rate, Jarrell used 18.5%, derived through a standard WACC methodology. Valuation reference sources would suggest a discount rate of 21.82% for Trados in 2005. *See* JX 669 at 27 (comparing Jarrell's WACC to an Ibbotson Associates report). The plaintiff did not criticize the discount rate before or during trial.

Using these figures, the sum of the present value of the terminal value, tax sav-

**47.** *See, e.g., Gearreald v. Just Care, Inc.,* 2012 WL 1569818, at *7 (Del.Ch. Apr. 30, 2012) (applying 5.5%); *S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.,* 2011 WL 863007, at *21 (Del.Ch. Mar. 9, 2011) (applying 1–3%), *aff'd,* 35 A.3d 419 (Del.2011); *Global GT,* 993 A.2d at 513 (applying 5%); *In re PNB Hldg. Co. S'holders Litig.,* 2006 WL 2403999, at *31 (Del.Ch. Aug. 18, 2006) (applying 5%); *Del. Open MRI Radiology Assocs., P.A. v. Kessler,* 898 A.2d 290, 337 (Del.Ch.2006) (applying 4%); *Henke v. Trilithic Inc.,* 2005 WL 2899677, at *10 (Del.Ch. Oct. 28, 2005) (applying 5%); *Andaloro v. PFPC Worldwide, Inc.,* 2005 WL 2045640, at *13 (Del.Ch. Aug.

19, 2005) (applying 5%); *Gholl v. Emachines, Inc.,* 2004 WL 2847865, at *13 (Del.Ch. Nov. 24, 2004) (applying 5%), *aff'd,* 875 A.2d 632 (Del.2005); *Dobler v. Montgomery Cellular Hldg. Co., Inc.,* 2004 WL 2271592, at *7, *17 (Del.Ch. Sept. 30, 2004) (applying 4%), *aff'd in part, rev'd in part,* 880 A.2d 206 (Del.2005); *Prescott Gp. Small Cap, L.P. v. Coleman Co., Inc.,* 2004 WL 2059515, at *30 (Del.Ch. Sept. 8, 2004) (applying 5%); *Lane v. Cancer Treatment Ctrs. of Am., Inc.,* 2004 WL 1752847, at *31 (Del.Ch. July 30, 2004) (applying 5%); *Cede & Co. v. JRC Acq. Corp.,* 2004 WL 286963, at *6 (Del.Ch. Feb. 10, 2004) (applying 3.5%).

ings, and cash flows was $48.6 million. Adding back Trados's cash on hand as of the Merger produced a going concern value for Trados of $51.9 million.

As Jarrell explained at trial, the $51.9 million generated by his DCF represented the best case scenario that the plaintiff claimed that the Board should have pursued:

[O]ne of the important questions on the table here is what would be the value of Trados if it had decided not to sell itself, if it had just, you know, said, "Look, let's try to make this work and let's see what we're going to be worth down the road." And I think that the answer is given by this DCF analysis. At least the best point estimate would be given by this DCF analysis, because the DCF analysis is based on [Campbell's] projections that basically assume you hit a home run with respect to these plans. And they do not include certain of the costs.

So if everything went right, you stayed the course, you stayed independent ... [and] Trados went out and figured out a way to do this new plan and get these revenues and get these profits and not have to spend much money doing it, then this would be what would happen.... [T]he present value of that plan is given by this DCF analysis.

Tr. 1184–85. The present value of the DCF, based on Campbell's business plan, was less than the Merger proceeds of $60 million.

Becklean did not prepare a DCF analysis, opting instead for three alternative methods. First, he valued Trados using LTM revenue multiples derived from the comparable companies JMP produced in early 2005. This method generated an implied value for Trados of $43.0 million. Becklean added a 25% control premium to imply a value of $53.7 million (below the Merger price). Second, Becklean valued Trados using LTM revenue multiples generated from a survey of transactions in the Capital IQ database involving companies in the "enterprise software industry" ranging in deal value from $50–250 million. JX 593 at 12. This method generated an implied value for Trados of $68.2 million. Third, Becklean valued Trados using a comparables-of-comparables analysis in which he derived a list of comparable transactions by looking at lists of comparable transactions generated by investment bankers in fairness opinions for target companies deemed comparable to Trados. *See id.* at 13. The LTM revenue multiple derived from the comparables-of-comparables approach generated an implied value for Trados of $85.4 million.

There are a number of problems with Becklean's work in this case. For one, in the two comparable transaction methodologies that generated values greater than the Merger price, Becklean did not back out any synergies. As estimates of stand-alone value, those figures are unreliably high. *See Montgomery Cellular,* 880 A.2d at 222; *Union Ill.,* 847 A.2d at 356. For another, Becklean gamed the relative weightings of his three methodologies. In his initial report from 2008, Becklean weighted the three methods equally and stated there was no reason to emphasize one over another. His 2008 report made some errors that produced higher valuations than those set forth above. After Jarrell offered his criticisms of the report, Becklean issued a revised report in 2011 that adopted some of Jarrell's suggestions, thereby lowering his valuations. To compensate, Becklean gave a 60% weight to his comparables-of-comparables approach and 20% weightings to the others, which brought his valuation back up to $75.6 million. An equal weighting would have produced a figure of $69.1 million. Beck-

lean justified the new weighting as a "feels right sort of thing." Tr. 1130.

Yet another problem was Becklean's failure to demonstrate that the reference companies and transactions he used were comparable to Trados. "[T]he utility of a market-based method depends on actually having companies that are sufficiently comparable that their trading multiples provide a relevant insight into the subject company's own growth prospects. When there are a number of corporations competing in a similar industry, the method is easiest to deploy reliably." *In re Orchard Enters., Inc.*, 2012 WL 2923305, at *9 (Del. Ch. July 18, 2012). Becklean's data sets generated wide ranges of multiples (0.5–8.5 for one; 0.4–21.0 for another; and 0.9–3.6 for a third), indicating that the companies in each data set were not in fact comparable. *See, e.g., JRC Acq.*, 2004 WL 286963, at *11 (excluding comparables analysis where the wide range violated "any concept of comparability"). More focused analysis revealed significant differences. For example, in his enterprise software transactions analysis, Becklean applied transaction multiples derived from acquired enterprise software companies. *See* JX 593 at 12. Although Trados was trying to establish itself as an enterprise software company, it had not achieved that goal at the time of the Merger. In 2004, Trados generated 38% of revenue from enterprise software sales; in 2005, Trados budgeted 46% from enterprise software sales. *See* JX 447 at 50581–82. Becklean's application of an enterprise software multiple to 100% of Trados's revenue was misleading because enterprise software companies were more highly valued than Trados's residual business.

Becklean came closest to the mark with a modified version of Jarrell's DCF that used an exit multiple derived from his comparable company analysis to calculate the terminal value. This method generated an implied value for Trados of $77.8 million. When valuing a VC-backed portfolio company, using an exit multiple could make sense, because this technique recognizes that VCs often exit through trade sales. In this case, however, at least two problems fatally undermined Becklean's modified DCF, one methodological and the other factual.

From a methodological standpoint, Becklean did not use the same set of seventeen comparable companies for his exit multiple that he used in his comparable companies analysis. Becklean reduced his original seventeen to twelve and then to eight, thereby compromising the credibility of all three sets. If the seventeen companies used originally were really the best comparables, why change them? If the later cuts were better, why use the first set?

As a factual matter, Becklean's modified DCF assumed Trados could be sold at the end of the projection period for 1.3–1.7 times revenue with the uncertainty surrounding that outcome appropriately captured in Jarrell's discount rate of 18.5%, a relatively conservative WACC for Trados. But the evidence at trial demonstrated that the market for companies in the translation space was consolidating rapidly. Two of Trados's most logical transaction partners—Bowne and Lionbridge—combined in 2005. The relative scarcity of suitable acquirers was not matched by a similar shortage of targets. Trados was one of several translation companies on the market, so if Trados passed on a sale to SDL, then SDL could go elsewhere. To the extent SDL made other acquisitions, it is far from certain that SDL would have had the same level of interest in Trados in the future. Although Campbell planned as an alternative to a near-term sale the repositioning of Trados as a content manage-

ment company with the potential to merge-up at a higher multiple in that space, that path presented the greatest risk because of the need to transition the business, obtain capital, and have an acquirer credit the Company's greater value. To anticipate that Trados could exit through a sale at the end of the projection period and use the same discount rate that Jarrell used for stand-alone cash flows underestimates the uncertainty associated with that path.

Jarrell's DCF valuation addressed the central question of fairness presented by this case. Jarrell made reasonable and plaintiff-friendly assumptions, yet his valuation still did not generate any return for the common. His work provided helpful input on the issue of fair price. Becklean's did not.

### c. The Unitary Determination Of Fairness

██ Although the defendant directors did not adopt any protective provisions, failed to consider the common stockholders, and sought to exit without recognizing the conflicts of interest presented by the Merger, they nevertheless proved that the transaction was fair. The Delaware Supreme Court has characterized the proper "test of fairness" as whether "the minority stockholder shall receive the substantial equivalent in value of what he had before." *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del.1952); *accord Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del.1985). If Trados's common stock had no economic value before the Merger, then the common stockholders received the substantial equivalent in value of what they had before, and the Merger satisfies the test of fairness. *See Blackmore P'rs*, 864 A.2d at 85–86 (recognizing that the defendants could satisfy the entire fairness test if they proved that "there was no future for the business and no better alternative for the unit holders"); *see also Orban*, 1997 WL 153831.[48]

Despite the directors' often problematic testimony, they proved that Trados did not have a reasonable prospect of generating value for the common stock. Trados's ability to do so depended on financing its business plan with internally generated cash and the remaining venture debt. To the extent Trados needed outside funds, the Company could not raise them. None of the VC firms would put more money

48. In *Orban*, Chancellor Allen assumed that the entire fairness test would apply to a recapitalization and third party merger in which all of the consideration went to the preferred stockholders to satisfy their liquidation preference, leaving nothing for the common. 1997 WL 153831, at *1. It was undisputed that (i) the merger was an arm's length transaction, (ii) the price paid by the acquirer was a fair price for the corporation, and (iii) the board believed the merger represented the best transaction available. To obtain pooling of interests accounting treatment, however, the transaction was structured to require the affirmative vote of 90% of the common stockholders. This feature enabled a large common holder to threaten to block the deal unless he received side consideration. In response, the board took action to facilitate the dilution of his voting interest, thereby removing his blocking power. *Id.* at *6–7. In the ensuing lawsuit, the common stockholder did not argue that his shares had economic value but rather that the 90% approval condition *"gave [his] stock a certain value,"* namely holdup value. *Id.* at *8. Moreover, the 90% approval condition was not a property right of the common stock, but rather a condition included in the transaction for the benefit of the acquirer. *Id.* at *9. Under those circumstances, where the common stock had no economic value before the transaction and was not deprived of any property right, Chancellor Allen held that the transaction satisfied the entire fairness test. To my mind, the fiduciary principles implied by *Orban* are the same as those applied in this case. The difference is one of degree: the MIP neutralized common stockholder opposition subtly; the dilution in *Orban* did so directly.

into Trados, and they had no obligation to. *See Equity–Linked*, 705 A.2d at 1057 ("[The preferred stockholders] were unwilling to put in more money. The preferred is of course not to be criticized for that. They have every right to send no good dollars after bad ones. Indeed, they had the right to withhold necessary consents to salvage plans unless their demands were satisfied."). As a practical matter no outside VC firm would invest without participation from the Company's existing backers.[49]

Trados also could not return to the venture debt market. Venture debt providers are not like commercial lenders who rely primarily on the strength of a business and its cash flows. Venture debt providers see themselves as bridging a company to the next round of VC financing or a sale. *See* Darian M. Ibrahim, *Debt as Venture Capital*, 2010 U. Ill. L.Rev. 1169, 1173 (2010). Trados had played the venture debt card for its stage.

If Trados could not self-fund its business plan, then the Company could not execute it. Even if it could self-fund, Trados had to build value at a rate exceeding the 8% cumulative dividend earned by the preferred to generate a return for the common. Having considered the directors' trial testimony, the documentary record, and Jarrell's DCF analysis, I believe that Trados would not be able to grow at a rate that would yield value for the common. Trados likely could self-fund, avoid bankruptcy, and continue operating, but it did not have a realistic chance of generating a sufficient return to escape the gravitational pull of the large liquidation preference and cumulative dividend.

I reach this conclusion despite regarding Trados's prospects as more bullish than the gloomy picture painted by the defendants, particularly with a savvy operator like Campbell at the helm. As noted, I do not believe Trados faced mortal crises, but it did face risks. Its business was volatile, and Trados could suffer a bad quarter or lose market share to competitors. And the external threats were becoming more serious. Lionbridge had been a longtime business partner, but in 2004 it began competing directly with Trados. In 2005, Lionbridge first acquired Logoport, a translation software company, then agreed to acquire Bowne, historically another large Trados customer. Other smaller translation companies like Idiom and GlobalSight were seeking buyers, suggesting a soft market. Given optimal conditions, Jarrell's DCF analysis demonstrated that the February 2005 business plan would not generate value for the common. The conditions Trados faced were not as dire as the defendants claimed, but they were suboptimal.

---

49. *See* Tr. 280 (Scanlan); Tr. 369 (Gandhi); Tr. 705–07 (Stone); *see also* Josè M. Padilla, *What's Wrong with a Washout?: Fiduciary Duties of the Venture Capitalist Investor in a Washout Financing*, 1 Hous. Bus. & Tax L.J. 269, 279–80 (2001) ("[V]enture capitalists will not invest in a company where existing investors do not participate."); Joseph W. Bartlett & Kevin R. Garlitz, *Fiduciary Duties in Burnout/Cramdown Financings*, 20 J. Corp. L. 593, 601 (1995) ("[O]nce a group of VCs have invested, it is rare that an issuer will have the ability to raise substantial capital unless the existing investors agree to 'play'—continue to invest—in future rounds of financing.... [T]he company can be given the putative opportunity to seek alternative sources, but the venture capital community is small and incestuous, with most managers knowing each other. If the company's existing cadre of VC investors is not willing to continue to support the company, then it is unlikely that any new investor will be interested."). For outside VCs to invest without existing investor participation would run the risk of buying a lemon. *See generally* George A. Akerlof, *The Market for "Lemons": Quality Uncertainty and the Market Mechanism*, 84 Q.J. Econ. 488 (1970).

In light of this reality, the directors breached no duty to the common stock by agreeing to a Merger in which the common stock received nothing. The common stock had no economic value before the Merger, and the common stockholders received in the Merger the substantial equivalent in value of what they had before.

Under the circumstances of this case, the fact that the directors did not follow a fair process does not constitute a separate breach of duty. As the Delaware Supreme Court has recognized, an unfair process can infect the price, result in a finding of breach, and warrant a potential remedy. *See, e.g., Kahn v. Tremont Corp.,* 694 A.2d 422, 432 (Del.1997) ("[H]ere, the process is so intertwined with price that under *Weinberger's* unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."). On these facts, such a finding is not warranted. The defendants' failure to deploy a procedural device such as a special committee resulted in their being forced to prove at trial that the Merger was entirely fair. Having done so, they have demonstrated that they did not commit a fiduciary breach.

## B. The Appraisal Claim

The determination that no breach of duty occurred because the Merger price was fair does not necessarily moot the companion appraisal proceeding. "In an entire fairness case, the matter only proceeds to the remedial phase if the transaction fails the test of fairness." *Reis,* 28 A.3d at 466. "The value of a corporation is not a point on a line, but a range of reasonable values ...." *Cede & Co. v. Technicolor, Inc.,* 2003 WL 23700218, at *2 (Del.Ch. Dec. 31, 2003), *aff'd in part, rev'd in part on other grounds,* 884 A.2d 26 (Del.2005). A court could conclude that a price fell within the range of fairness and

would not support fiduciary liability, yet still find that the point calculation demanded by the appraisal statute yields an award in excess of the merger price. *Compare Technicolor III,* 663 A.2d at 1176–77 (affirming determination that merger consideration of $23 per share was entirely fair), *with Cede & Co. v. Technicolor, Inc.,* 884 A.2d 26, 30 (Del.2005) (awarding fair value in appraisal of $28.41 per share).

This case will not support a higher point determination. The Supreme Court "has defined 'fair value' as the value to a stockholder of the firm as a going concern, as opposed to the firm's value in the context of an acquisition or other transaction." *Golden Telecom,* 11 A.3d at 217. If Trados continued to operate as a stand-alone entity, then the common stock had no economic value, whether for purposes of an entire fairness case or an appraisal proceeding. Trados had no realistic chance of growing fast enough to overcome the preferred stock's existing liquidation preference and 8% cumulative dividend. The fair value of Trados's common stock for purposes of 8 *Del. C.* § 262 is zero.

## C. The Request For An Award Of Attorneys' Fees And Expenses

In addition to the prospect of a fee award if he prevailed, the plaintiff preserved the right to seek fees and expenses under the bad faith exception to the American Rule. "Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims." *Johnston v. Arbitrium (Cayman Is.) Handels AG,* 720 A.2d 542, 546 (Del.1998) (footnotes omitted). Bad faith conduct also can include reversing position on issues and changing testimony to suit the moment. *See Montgomery Cellular,* 880 A.2d at 227–28. "The purpose

of the 'bad faith' exception is to 'deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process.'" *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (quoting *Schlank v. Williams*, 572 A.2d 101, 108 (D.C.App.1990)).

There is good reason to think that fees might be shifted. Serial failures to produce documents marred the discovery process. The plaintiff filed four motions to compel, each of which prompted the production of additional documents either to moot the motion, after receiving guidance from the court, or because the motion was granted at least in part. On one occasion, Chancellor Chandler deferred ruling on whether to impose sanctions until the completion of the case. *See Christen v. Trados Inc.*, 2008 WL 5255817, at *2 (Del.Ch. Dec. 12, 2008). Viewed as a whole, the defendants' conduct during discovery could have needlessly increased the litigation's cost.

The defendants also filed three separate motions for summary judgment. At least one—the motion for summary judgment in the appraisal case—could be regarded as frivolous. This motion argued that the plaintiff waived his appraisal rights under a stockholder agreement when the Merger agreement itself provided for appraisal.

The directors' frequently less-than-credible trial testimony and their changes of position between deposition and trial could provide a further basis for fee-shifting. So too could the directors' belated disavowal of the four sets of minutes in which the Board ostensibly determined in good faith that the fair value of the common stock was $0.10 per share and upon which this court previously relied.

At this point, the parties have not briefed the question of fee-shifting. For present purposes it suffices to grant the plaintiff leave to make a formal application.

## III. CONCLUSION

The defendants proved that the decision to approve the Merger was entirely fair. The fair value of the common stock for purposes of appraisal was zero. Within ten days, the parties shall confer and submit a stipulation establishing a briefing schedule for the plaintiff's fee application.